# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2003-DR-01881-SCT

*EDDIE LEE HOWARD, JR.*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/25/2000 |
| TRIAL JUDGE: | HON. LEE J. HOWARD |
| COURT FROM WHICH APPEALED: | LOWNDES COUNTY CIRCUIT COURT |
| ATTORNEYS FOR PETITIONER: | MISSISSIPPI OFFICE OF CAPITAL POST-CONVICTION COUNSEL |
| | BY: ROBERT M. RYAN |
| | LOUWLYNN VANZETTA WILLIAMS |
| | WILLIAM J. CLAYTON |
| ATTORNEYS FOR RESPONDENT: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JUDY T. MARTIN |
| DISTRICT ATTORNEY: | FORREST ALLGOOD |
| NATURE OF THE CASE: | CIVIL - DEATH PENALTY - POST-CONVICTION |
| DISPOSITION: | PETITION FOR POST-CONVICTION RELIEF DENIED -09/28/2006 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**WALLER, PRESIDING JUSTICE, FOR THE COURT:**

¶1. After Georgie Kemp, age 84, was found murdered in her home, Eddie Lee Howard, Jr., was indicted on the charge of capital murder with the underlying felony of rape. He was found guilty and a jury sentenced him to death. On appeal, we held that Howard's waiver of his right to counsel in order to represent himself was not voluntary, that the circuit court

erred in failing to conduct a competency hearing before allowing Howard to represent himself, and that the circuit court erred in denying Howard's request to have standby counsel deliver his closing argument. We reversed the conviction and remanded the case for a new trial. *Howard v. State*, 697 So. 2d 415 (Miss. 1997), *republished as corrected*, 701 So. 2d 274 (Miss. 1997) ("*Howard I*").

¶2.     Shortly before the second trial, the indictment was amended to charge Howard as a habitual offender. Howard was again convicted of capital murder with the underlying felony of rape and sentenced to death. On appeal, we found no reversible error and affirmed the judgment of the circuit court. *Howard v. State*, 853 So. 2d 781 (Miss. 2003) ("*Howard II*"). The United States Supreme Court denied Howard's petition for writ of certiorari. *Howard v. Mississippi*, 540 U.S. 1197, 124 S. Ct. 1455, 158 L. Ed. 2d 113 (2004). Howard, represented by the Mississippi Office of Capital Post-Conviction Counsel, has filed his petition for post-conviction collateral relief. We have fully reviewed Howard's petition and supplements, and, finding no meritorious claims, we deny Howard's petition for post-conviction collateral relief.

### FACTS AND PROCEDURAL HISTORY

¶3.     On the evening of February 2, 1992, a neighbor of Georgie Kemp noticed smoke coming from Kemp's home and called 911. Firefighters found two small smoldering fires in the living room. Firefighters also found Kemp's body on the floor of her bedroom, although the fire had not produced enough smoke to cause her death. As firefighters confirmed that Kemp was dead, one noticed that her nightgown was pulled up and that her

2

legs were a bit scraped up and bloodied. One firefighter noticed a knife on the bed, which appeared to have blood on it, and noticed that the phone had been knocked onto the floor. Firefighters notified police officers and requested that the coroner be called. An autopsy revealed that Kemp had been beaten, strangled, and stabbed.[1] The autopsy also revealed injuries to Kemp's vaginal wall consistent with forced sexual intercourse.

¶4.    Police officers developed Eddie Lee Howard, Jr., as a suspect. Howard was taken to a local dentist, Dr. David Curtis, and dental impressions were taken. Dr. Michael West, a dentist who holds himself out to be a forensic odontologist, examined Kemp's body and found to a reasonable degree of certainty that the molds from Howard's teeth matched the bite mark on Kemp's breast.[2] Howard was arrested for Kemp's murder on February 8, 1992. Police Investigator David Turner testified that on February 13, Howard gave an incriminating

---

[1]Dr. Steven Hayne, M.D., anatomical, clinical and forensic pathologist for the State, conducted the autopsy on February 3, 1992, the day after the murder. During the first examination, Dr. Hayne did not find injuries to Kemp's right forearm, right side of her neck, or to her right breast. Kemp's body was then buried. On February 6th, after Kemp's burial, Investigator David Turner contacted Dr. Michael West and had Howard's dental impression taken. With respect to Dr. West's involvement, Dr. Hayne requested this and believed additional study was indicated. On February 7th, the body was exhumed and Dr. West examined the body with Dr. Hayne. Dr. West found bite marks on Kemp's right forearm, right side of her neck, and right breast.

[2]Dr. West also opined that Howard's dental mold was "consistent" with the bite marks on the arm and neck. Dr. West explained that "consistent" meant he could not exclude Howard as the biter, and that he could not state with any certainty that Howard was the biter.

statement.[3] Howard was later indicted for the capital murder of Kemp, with the underlying felony of rape.

Howard was initially represented by Richard Burdine. In February 1993, Burdine was replaced by Douglas Stone. Stone served as Howard's counsel until five weeks prior to the trial, which ensued on May 9, 1994. During the period of representation by both Burdine and Stone, few motions were filed. Though one trial date drew so close that Stone received a continuance only on the eve of the trial, no motion to test the admissibility of the State's dental impression evidence or the alleged confessionary comments were ever filed by either of Howard's attorneys. Though the only evidence which linked the defendant to the crime scene itself were the dental impressions, neither Burdine nor Stone made a serious effort to obtain funds for an expert to investigate the reliability of the bite-mark comparison or to counter the testimony of the State's dental expert. Nearly two and one-half years after his arrest, Howard appeared before the trial judge and requested that he receive his speedy trial and that the judge not grant his attorneys any more continuances. The judge responded that the defendant would have to cooperate with his attorneys and accept their judgment as to the timing of the trial, and noted that Howard had "an absolute right" to represent himself if he could not cooperate with his attorneys.

Howard at that point determined that he wished to carry out his own defense. The trial judge appointed Thomas Kesler and Armstrong Walters to serve as standby counsel at the trial and to assist Howard with procedural matters. Howard never filed any pretrial motions in the case, and proceeded to trial on May 9, 1994.

---

[3]Turner testified that Howard sent a note that he wanted to speak with Turner. Turner testified that Howard said that the crime was solved and that the crime would not have happened if Howard did not have a temper. There were no other witnesses to this statement and the statement was not recorded. Howard did not discuss any details of the crime. Turner did not ask Howard to write and sign a statement. Howard refused to sign a form waiving his rights.

4

*Howard I*, 701 So.2d. at 278. Howard was convicted of capital murder and sentenced to death. Armstrong Walters and Donna Sue Smith represented Howard on appeal. We found that

> [t]he court below could not have known whether Howard was capable of knowingly and intelligently waiving the right to counsel, as a competency hearing should have been ordered before or during the proceedings. The failure to do so, under these circumstances, constitutes error.

*Howard I*, 701 So. 2d at 284. We also found that the circuit court erred when it refused Howard's request that his standby counsel deliver his closing argument. *Id.* at 287. We reversed Howard's conviction and sentence and remanded the case for a new trial. *Id.* at 288.

¶5. Attorneys Tom Kesler and Armstrong Walters were appointed to represent Howard in his second trial. The jury found Howard guilty of capital murder with the underlying felony of rape and sentenced him to death. Kesler was appointed to represent Howard on appeal. Kesler filed an appellate brief which raised only one issue and the entire argument consisted of one page. We remanded this matter to the circuit court for the appointment of competent appellate counsel. Walters and Gary Goodwin were appointed to represent Howard on appeal. On this appeal, this Court considered the following issues:

    I.      Whether the Verdict Was Against the Weight and Sufficiency of the Evidence.

    II.     Whether the Circuit Court Erred in Refusing to Grant a Peremptory Instruction of "Not Guilty" Due to the Insufficiency of Evidence to Support the Conviction.

    III.    Whether the Circuit Court Erred in Allowing the Testimony of Paris Lowery from Howard's First Trial to Be Read into the Record.

IV. Whether the Circuit Court Erred in Refusing Howard's Motion for Mistrial When a Prosecution Witness Stated That Howard Had Previously Been in the Penitentiary.

V. Whether the Circuit Court Erred in Refusing Howard's Proposed Jury Instruction Regarding Reasonable Doubt.

VI. Whether the Circuit Court Erred in Refusing to Declare a Mistrial During the Penalty Phase and Impose a Life Sentence upon the Failure of the Jury to Return a Unanimous Verdict Thereby Ultimately Coercing a Verdict of Death from the Jury.

VII. Whether the Circuit Court Erred in Failing to Insure That Howard Received a Proper Mental Examination Consistent with the Court's Order Entered after Remand on the First Appeal and Whether this Error Was Compounded by Failing to Conduct a Competency Examination as Seemingly Directed by this Court.

VIII. Whether the Circuit Court Erred in Allowing Forensic Odontologist Testimony Where the Prior Decision on First Appeal Condemned Such Scientific Evidence Therefore Making the Exclusion of Such Evidence the Law of the Case.

IX. Whether Trial Counsel Walters and Kesler Failed to Provide Howard with Constitutionally Effective Assistance of Counsel.

X. Whether the Circuit Judge Made Improper Facial Expressions During Defense Counsel's Opening Statement and Closing Argument.

XI. Whether the Officers Involved in the Numerous Interrogations of Howard Failed to Read the Miranda Warnings Prior to Each of the Interrogation Sessions.

XII. Whether the District Attorney And/or His Assistants, the Commander of the Police Detectives, and the Chief of Police Conspired to Conceal the Results of the DNA Evidence Sent to the State Crime Lab to Be Analyzed.

XIII. Whether the Sentence of Death Was Proportionate.

¶6.     We found no reversible error in the second appeal and affirmed the conviction and sentence of death. *Howard II*, 853 So. 2d at 784. The mandate issued on September 18, 2003.

¶7.     In August of 2003, the Mississippi Office of Capital Post-Conviction Counsel (MOCPCC) was appointed to represent Howard in his post-conviction relief proceedings. MOCPCC immediately sent a letter to District Attorney Forrest Allgood requesting, pursuant to M.R.A.P. 22(c)(4)(ii), that the complete files of all law enforcement agencies involved in the case be made available to MOCPCC for inspection and copying. This was the beginning of a very contentious discovery process and alleged discovery violations are an issue in this case.

¶8.     Numerous motions were filed in this Court and in the circuit court seeking discovery. By Order entered on September 17, 2004, a panel of this Court noted that in August 2004 the circuit court granted Howard's motion for discovery as to certain records and documents. The circuit court's order was entered less than a month before the statute of limitations period for Howard's post-conviction relief petition was set to expire. We found, in pertinent part,

> The circuit court ordered the various law enforcement agencies to make the records and documents available to Howard for inspection and copying. It is the State's duty to obtain the records and documents from the various agencies and make them available to Howard's counsel. *Henderson v. State*, 367 So. 2d 1366, 1367 (Miss. 1979). In light of these very specific circumstances and the fact that this is a death penalty case, pursuant to this Court's holding in *Puckett*, the panel finds that the statute of limitations should be equitably tolled for thirty (30) days. *Puckett*, 834 So. 2d at 678.

7

(citing ***Puckett v. State***, 834 So. 2d 676 (Miss. 2002)).  By Order entered on November 4,

2004, we found, in pertinent part,

> After due consideration, the panel finds that Howard timely filed
> his Motion for Leave to Proceed in the Trial Court with a
> Petition for Post-Conviction Relief.  The panel further finds that
> counsel for Howard has not been as diligent as they should have
> been in pursuing discovery in a timely manner.  The panel
> further finds that the District Attorney's Office and the Attorney
> General's Office have been less than completely cooperative in
> producing discoverable items.  Both parties are to blame for the
> present situation and such conduct will not be tolerated in the
> future.

We granted Howard's motion to supplement and/or amend his petition for post-conviction

collateral relief and set a deadline for the completion of discovery.  Howard timely filed his

"Supplement/Amendment to Petition for Post-Conviction Relief with Exhibits."

¶9.     On April 12, 2005, the State filed its "Supplemental Discovery Notice and Motion to

Stay the Briefing Schedule Pending Response from Petitioner."  In an Order entered on June

10, 2005, we found, in pertinent part,

> the State filed the present supplemental discovery notice and, on
> or about that same date, produced to Howard a box containing
> physical evidence which had not previously been produced by
> the State. . . .  Howard should be granted a reasonable amount
> of time to inspect the recently produced evidence.  If Howard
> determines that expert funding and assistance is necessary, he
> should request that funding and assistance from the convicting
> court.  *See **Russell v. State***, 819 So. 2d 1177 (Miss. 2001);
> M.R.A.P. 22(c)(3); Miss. Code Ann. § 99-15-18.  The
> undersigned finds that Howard should be granted leave to file a
> supplement to his post-conviction relief petition.  The
> undersigned further finds that the State should be given a
> reasonable amount of time to prepare and file a single response
> in this matter.

8

Howard timely filed his "Second Supplement to Petition for Post-Conviction Relief with Exhibits." The State filed its response to all of Howard's post-conviction relief pleadings and Howard has filed a reply to that response. These pleadings are now ripe for consideration.

## DISCUSSION

I. **WHETHER THE STATE INTENTIONALLY, DELIBERATELY AND UNFAIRLY CONCEALED AND WITHHELD EXCULPATORY AND MATERIAL EVIDENCE FROM THE PETITIONER IN VIOLATION OF HIS FUNDAMENTAL DUE PROCESS AND SIXTH AMENDMENT RIGHTS, BEING CONTRARY TO THE UNITED STATES SUPREME COURT HOLDINGS IN *BRADY v. MARYLAND, GIGLIO v. UNITED STATES,* AND *BANKS v. DRETKE*.**

¶10. Howard argues that he was denied a fair trial due to prosecutorial misconduct. Howard asserts that numerous State actors, including members of the Columbus Police Department, Allgood, and staff members of the Office of the Attorney General of the State of Mississippi have intentionally, knowingly, and deliberately concealed, withheld, and refused to produce exculpatory and material evidence. Howard argues that, pursuant to *Brady v. Maryland* and its progeny, he is entitled to the vacation of his conviction and death sentence and that the indictment should be dismissed with prejudice.[4] Alternatively, Howard contends that he is entitled to a new trial.

¶11. Howard relies on the United States Supreme Court decision in *Brady v. Maryland* which held that "the suppression by the prosecution of evidence favorable to an accused upon

---

[4]See issue III for discussion of arguments regarding dismissing the indictment.

9

request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97, 10 L. Ed. 2d 215, 218 (1963). Evidence is favorable to an accused when the "evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Simon v. State*, 857 So. 2d 668, 699 (Miss. 2003) (quoting *Kyles v. Whitley*, 514 U.S. 419, 433, 115 S. Ct. 1555, 1565, 131 L. Ed. 2d 490, 505 (1995) and *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383, 87 L. Ed. 2d 481, 494 (1985)). We have held

> To establish a *Brady* violation a defendant must prove the following: (1) that the government possessed evidence favorable to the defendant (including impeachment evidence); (2) that the defendant does not possess the evidence nor could he obtain it himself with any reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and (4) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different. [*United States v.*] *Spagnoulo*, 960 F.2d 990, 994 (11th Cir. 1992), citing *United States v. Meros*, 866 F.2d 1304, 1308 (11th Cir. 1989), *cert. denied*, 493 U.S. 932, 110 S. Ct. 322, 107 L. Ed. 2d 312 (1989).

*King v. State*, 656 So. 2d 1168, 1174 (Miss. 1995).

## A.    Biological evidence

¶12.    Howard first alleges that "a plethora" of samples of DNA evidence were collected by the State and submitted to the Mississippi Crime Lab for examination. Howard asserts that the existence of this evidence and the test results were concealed and that this DNA evidence

is "100 percent exculpatory, relevant and material to Howard's defense of the charges levied against him."

¶13.    Howard's arguments are without merit for several reasons.  First, there has never been any DNA testing in this case even though Howard was recently given the opportunity to seek DNA testing by this Court.  Therefore, there is no proof that any biological evidence is "100 percent exculpatory."  Second, the trial transcript clearly shows that Howard's counsel was aware of the biological evidence which had been collected and sent to the crime lab.  Third, the State offers evidence that the existence of the biological evidence was disclosed to Howard's counsel prior to both trials.

¶14.    A thorough examination of the appellate record and all evidence submitted by Howard and the State reveals that no DNA testing has ever been performed in this case.  Biological evidence including, but not limited to, the rape kit, blood samples from Kemp and Howard, blood stained sheets and clothing, pubic hair combings from Kemp and Howard, the bloody knife, and Kemp's fingernail scrapings were submitted to the crime lab for testing.  At the time, the crime lab was not performing DNA testing and samples of the evidence were not sent to any other lab for DNA testing.  The crime lab did perform certain tests which tend to show that DNA testing would not have been helpful to either side.  For example, the crime lab tested the rape kit, but no seminal fluid was found.  The lab tested evidence for fingerprints, but only found Kemp's fingerprints.  The lab tested various items for blood type.  All of the items tested were consistent with Kemp's blood type and inconsistent with Howard's type.  The crime lab did not find any "hairs of Negroid origin" in Kemp's pubic

11

combing and "[n]o hairs of Caucasian origin" were found in Howard's pubic combing. It appears that the biological evidence in this case is neither exculpatory nor incriminatory.

¶15. Additionally, as discussed above, the State produced a box of physical evidence to the MOCPCC. That box included, but was not limited to, a rape kit, blood samples, and pubic hairs. We granted Howard a reasonable amount of time to inspect that box of evidence and if Howard determined that expert funding and assistance were necessary, he was directed to request it from the circuit court. To date, Howard has not requested any such relief.

¶16. The transcript from the second trial also reveals that this argument is completely without merit. Two witnesses testified at trial regarding the collection of physical evidence, including biological evidence, and the submission of that evidence to the Mississippi Crime Lab. Specifically, David Turner, an investigator with the Columbus Police Department, testified that twenty-seven items were collected and submitted to the crime lab. Dr. Steven Hayne testified that he prepared a rape kit on the victim and submitted that to the crime lab. During Howard's second trial, defense counsel used the fact that there was no DNA evidence linking Howard to the crime in an effort to establish reasonable doubt with the jury.

¶17. Finally, the State asserts that all evidence was produced during pre-trial discovery and the State offers District Attorney Forrest Allgood's affidavit as proof.[5] Included with Allgood's affidavit are copies of documents produced to Howard and his counsel before his

---

[5]It should be noted that the State complains that several of Howard's exhibits to his pleadings are improper affidavits. Here, Allgood testifies about some things of which he apparently has no personal knowledge. It does appear that these things were kept in the normal course of business in the District Attorney's office.

12

first trial.[6]  Included in these documents are copies of crime scene reports, evidence submission forms to the crime lab, the Report of Post Mortem Examination, and numerous reports from the crime lab regarding the results of various testing.  Additionally, several crime lab employees were listed as potential witnesses for the State.  We find that no exculpatory DNA evidence was suppressed by the State and, therefore, there was no **Brady** violation.  **Brady**, 373 U.S. at 87, 83 S. Ct. at 1196-97; *see also* **Giglio v. United States**, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972); **Banks v. Dretke**, 540 U.S. 668, 124 S. Ct. 1256, 157 L. Ed. 2d 1166 (2004).

### B.      Information regarding alternative suspects

¶18.    Howard alleges that the State failed to disclose the existence of alternative suspects and this constituted a **Brady** violation.  Review of the discovery certificates included with Allgood's affidavit reveals that the information regarding these alternative suspects was disclosed to Howard and his attorneys prior to trial.  We find that no evidence of alternative suspects was suppressed by the State and, therefore, there was no **Brady** violation.  **Brady**, 373 U.S. at 87, 83 S. Ct. at 1196-97.

### C.      Two rolls of unprocessed 35 mm film

¶19.    As discussed above, the State found a box of physical evidence stored at the Columbus Police Department and produced it to the MOCPCC.  The box contained various items including two rolls of unprocessed 35 mm film.  Howard alleges that the existence of this film was concealed by the State.  Howard also alleges that photographs developed from

---

[6]Since Howard was proceeding pro se at times, some items were delivered directly to him with copies delivered to his stand-by counsel.

this film provide views of the crime scene which are not consistent with the photographs admitted into evidence at trial. Howard argues that these photographs show that the crime scene had been tampered with and that the photographs could have been used to impeach David Turner's testimony at trial. Howard contends that the State suppressed this favorable evidence in violation of *Brady* and he is entitled to a vacation of his conviction and sentence.

¶20. First, it appears that the existence of this film was disclosed to Howard and his counsel before trial. Included with Allgood's affidavit is a Discovery Certificate from the District Attorney's office dated September 22, 1993. This certificate was sent to Doug Stone, one of Howard's counsel before his first trial. This certificate specifically states that "[a]ny and all physical evidence is located at the Columbus Police Department and is available to you for inspection upon request by appointment." Also included with Allgood's affidavit is a letter addressed to Howard from the District Attorney's office dated April 24, 1994. This letter states, in pertinent part,

> Enclosed please find some additional material which was in the files of the Columbus Police Department but was not in our file. We are tendering you this material in discovery. Should any further discoverable material develop, we will tender the same to you in a prompt fashion.
>
> Please be advised that there are <u>a number of photographs which were taken of the crime scene that are likewise in the possession of the Columbus Police Department.</u> Should you desire to see these photographs, please make arrangements with the jailors to make a phone call and set up a[] time and place to view them. Someone from our office will be happy to display them to you.

(emphasis added). A copy of this letter was sent to Howard's stand-by counsel.

14

¶21.    Second, a careful comparison of the photographs admitted at trial with the "new"
photographs from the unprocessed film reveals that almost all of the "new" photographs are
cumulative.  Twelve photographs of the crime scene were admitted into evidence at trial as
exhibits S2A through S2L.  The "new" photographs consist of 29 additional photographs
taken at the crime scene.[7]  All but two of the "new" photographs are completely consistent
with those admitted at trial and, therefore, cumulative.[8]

¶22.    Two "new" photographs require some discussion.  Trial exhibit S2C is a photograph
taken in Kemp's bedroom from the foot of the bed.  S2C shows a red flashlight standing
vertically on the floor next to a bloody slipper.  "New" photograph number 103 shows the
same area of the room, but shows the red flashlight laying horizontally on top of the bloody
slipper.  Trial exhibit S2D shows the other corner of the foot of Kemp's bed.  This picture
shows the knife believed to be the murder weapon.  In S2D, the blade of the knife is pointing
toward the corner of the bed.  "New" photograph number 99 shows a wider view of the same
area of Kemp's bed.  However, in this photograph, the blade of the knife is pointing away
from the corner of the bed. "New" photographs numbered 99 and 103 are not completely
consistent with the trial exhibits.  As discussed above, in order to prove a ***Brady*** violation,
Howard must meet all four prongs of the test stated in ***King***, 656 So. 2d at 1174.  The fourth
prong of the test requires proof "that had the evidence been disclosed to the defense, a

---

[7]The "new" photographs also include several photographs taken during the autopsy.
Howard does not make any arguments about these autopsy photographs.

[8]Most of the "new" photographs are shots of the same subject matter as those admitted
at trial, just from different angles.  Some of the "new" photographs show areas of Kemp's
home which were not relevant at trial, like her kitchen.

15

reasonable probability exists that the outcome of the proceedings would have been different."

*Id.* Howard cannot meet this prong of the test. Accordingly, Howard cannot prove that the State violated *Brady*.

### D. Videotape, Fingernail scrapings, and Stewart's Cameras receipts

¶23. The box produced to the MOCPCC by the State in April 2005 also contained a video tape of the crime scene, fingernail scrapings, and two receipts from Stewart's Cameras in Hattiesburg. Howard argues that the MOCPCC's discovery of these items are additional examples of the State's suppression of favorable evidence. A careful comparison of the video with the photographs admitted at trial reveals that the video is consistent with, and cumulative of, the photographs admitted at trial. The discovery certificates included with Allgood's affidavit show that the existence of fingernail scrapings and the results of the crime lab testing on those scrapings were revealed to Howard and his counsel prior to trial. The discovery certificates also show that invoices from Stewart's Cameras were produced to Howard and his counsel prior to trial. Howard has failed to show that *Brady* violations occurred.

¶24. Howard has failed to prove that the State suppressed any favorable evidence. Howard is not entitled to any relief, and his petition for post-conviction collateral relief is denied as to this issue.[9]

---

[9]Howard requests that this Court "issue an order protecting the biological samples" maintained by the Mississippi Crime Lab. As has been discussed, by Order entered on June 10, 2005, Howard was given an opportunity to examine the biological evidence and to request expert funding and assistance from the trial court. There is no need for a protective order and Howard's motion is denied.

## II. WHETHER PETITIONER WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AT BOTH THE GUILT AND SENTENCING PHASES OF THE TRIAL WITHIN THE MEANING OF *STRICKLAND V. WASHINGTON* AND THE CORRESPONDING PORTIONS OF THE MISSISSIPPI CONSTITUTION.

¶25. Howard argues that he was denied constitutionally effective assistance of counsel.

We have stated the following regarding ineffective assistance of counsel:

> The standard for determining if a defendant received effective assistance of counsel is well settled. "The benchmark for judging any claim of ineffectiveness [of counsel] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington,* 466 U.S. 668, 686, 104 S. Ct. 2052, [2064,] 80 L. Ed. 2d 674 (1984). A defendant must demonstrate that his counsel's performance was deficient *and* that the deficiency prejudiced the defense of the case. *Id.* at 687, 104 S. Ct. [at 2064]. "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Stringer v. State,* 454 So. 2d 468, 477 (Miss. 1984) (citing *Strickland v. Washington,* 466 U.S. at 687, 104 S. Ct. [at 2064]). The focus of the inquiry must be whether counsel's assistance was reasonable considering all the circumstances. *Id.*

*Bishop v. State*, 882 So. 2d 135, 141 (Miss. 2004) (quoting *Burns v. State*, 813 So. 2d 668, 673 (Miss. 2001)) (emphasis in original). Howard argues that his trial counsels' performance was deficient in the following areas:

### A. Change of venue

¶26. Howard argues that his trial counsel were ineffective in failing to pursue a change of venue. Howard asserts that "due to his being an African-American and the victim being

17

white, it was imperative that he be tried in a county where the racial makeup was more favorable to him." He contends that because the first trial was conducted in Lowndes County, the second trial should have been held elsewhere.

¶27. Howard argues that since "black defendants who kill white victims are more likely to . . . receive a death sentence, it was incumbent upon Howard's trial attorneys to pursue a change in venue." Howard relies on *McCleskey v. Kemp*, 481 U.S. 279, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987). *McCleskey* requires proof "that the decisionmakers in his case acted with discriminatory purpose." *Id.* at 292, 107 S. Ct. at 1767. Howard "offers no evidence specific to his own case that would support an inference that racial considerations played a part in his sentence." *Id.* at 292-93, 107 S. Ct. at 1767. Additionally, this precise argument was rejected in *Mitchell v. State*, 886 So. 2d 704 (Miss. 2004):

> Mitchell asserts that counsel was ineffective due to his failure to "actively" seek a change of venue. Since he is an African-American and the victim was white, Mitchell maintains that "it was imperative that he be tried in a county where the racial make-up was more favorable to him." This Court, however, has previously held that "a defendant has no right to a change of venue to a jurisdiction with certain racial demographics." *De La Beckwith v. State*, 707 So. 2d 547, 597 (Miss. 1997). Mitchell was entitled only to a trial by an impartial jury representing a fair cross-section of the community. *Lanier v. State*, 533 So. 2d 473, 477 (Miss. 1988). A motion for a change of venue is not automatically granted in a capital case. There must be a satisfactory showing that a defendant cannot receive a fair and impartial trial in the county where the offense is charged. *Gray v. State*, 728 So. 2d 36, 65 (Miss. 1998). Mitchell has made no such showing.

*Mitchell*, 886 So. 2d at 709. Howard has not offered any proof that he did not receive "a fair and impartial trial in the county where the offense [was] charged." *Id*.

18

¶28.    Howard also alleges that there was a great deal of pretrial publicity which prevented a fair trial.  The record does not support this allegation.  During voir dire, the circuit court asked potential jurors who had been exposed to media accounts of the case, if they could "lay that aside and base [their] verdict solely on" what they heard in the courtroom.  Only one prospective juror responded that she could not and she was not seated on the jury.

¶29.    We have held

> that defense counsel is under no duty to attempt to transfer venue and, therefore, the decision not to would fall within the realm of strategy. [*Faraga v. State*, 514 So. 2d 295, 307 (Miss. 1987)] (citing *Murray v. Carrier*, 477 U.S. 478, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986)).  We find that, likewise, the decision to obtain a venue change is within the realm of strategy.

*Wilcher v. State*, 863 So. 2d 719, 750 (Miss. 2003); *Wilcher v. State*, 863 So. 2d 776, 811 (Miss. 2003).  In *Faraga*, every person in the venire had heard of the case.  Faraga argued that, due to pre-trial publicity, his counsel's failure to move for a venue change was ineffective assistance of counsel.  We held that Faraga could not meet either prong of the *Strickland* analysis.  *Id.* at 307; *see also Woodward v. State*, 843 So. 2d 1, 15-17 (Miss. 2003); *Cabello v. State*, 524 So. 2d 313, 316-17 (Miss. 1988); *Wiley v. State*, 517 So. 2d 1373, 1378 (Miss. 1987).

¶30.    We find that Howard has failed to "demonstrate that his counsel's performance was deficient and that the deficiency prejudiced the defense of the case." *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064.  Howard has failed to show that his trial counsel rendered ineffective assistance, and his petition is denied as to this issue.

**B.      The alleged failure to conduct an adequate investigation (generally)**

19

¶31.	Howard's next argument is virtually identical to an argument presented by the

MOCPCC and rejected by this Court in ***Byrom v. State***, 927 So. 2d 709 (Miss. 2006):

> Byrom next makes a general argument of law, citing
> ***Wiggins v. Smith***, 539 U.S. 510, 123 S. Ct. 2527, 156 L. Ed. 2d
> 471 (2003), as the "most recent definitive pronouncement from
> the United States Supreme Court concerning ineffective
> assistance of counsel claims." The United States Supreme Court
> found Wiggins received ineffective assistance of counsel where
> his trial counsel had failed to investigate and present mitigating
> evidence of Wiggins's background, including physical and
> sexual abuse committed by his mother, by a series of foster
> parents, and by a Job Corps supervisor, as well as evidence of
> mental retardation. 539 U.S. at 516-18, 123 S. Ct. at 2533.
> Counsel for Wiggins failed to make this investigation even
> though the State made funds available for this purpose. 539
> U.S. at 524, 123 S. Ct. at 2536. Trial counsel instead attempted
> to show that Wiggins was not responsible for the murder in
> question. 539 U.S. at 519, 123 S. Ct. at 2534. The Supreme
> Court stated:
>
>> In finding that Schlaich and Nethercott's
>> investigation did not meet ***Strickland's***
>> performance standards, we emphasize that
>> ***Strickland*** does not require counsel to investigate
>> every conceivable line of mitigating evidence no
>> matter how unlikely the effort would be to assist
>> the defendant at sentencing. Nor does ***Strickland***
>> require defense counsel to present mitigating
>> evidence at sentencing in every case. Both
>> conclusions would interfere with the
>> "constitutionally protected independence of
>> counsel" at the heart of ***Strickland***, 466 U.S. at
>> 689, 104 S. Ct. 2052, 80 L. Ed. 2d 674. We base
>> our conclusion on the much more limited
>> principle that "strategic choices made after less
>> than complete investigation are reasonable" only
>> to the extent that "reasonable professional
>> judgments support the limitations on
>> investigation." ***Id***., at 690-691, 466 U.S. 668, 104
>> S. Ct. 2052, 80 L. Ed. 2d 674. A decision not to

> investigate thus "must be directly assessed for reasonableness in all the circumstances." *Id.* at 691, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674.

> *Wiggins*, 539 U.S. at 533, 123 S. Ct. 2527. Under *Wiggins*, counsel may make strategic decisions to introduce, pursue or ignore certain evidence, but these decisions may amount to ineffective assistance if made based on an inadequate or unreasonable investigation.

*Byrom*, 927 So. 2d at 716-17.

¶32.    Howard further argues that the key element in *Wiggins* is the Supreme Court's use of the phrase "prevailing professional standards" and that these standards are further defined by the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases.  After appearing to argue that *Wiggins* set some kind of new standard in ineffective assistance cases, Howard then states that the United States Supreme Court "specifically made it clear that *Wiggins* does not create new law but simply re-adopts and clarifies the import of *Strickland*."  He cites numerous cases from other states and the federal courts where *Wiggins* and the ABA Guidelines have been cited, some where counsel was found to be ineffective.

¶33.    We have no problem with Howard's argument up to this point.  However, Howard then quotes a portion of our opinion in *Howard II* and states that we "noted in [our] decision that petitioner's counsel failed to conduct any meaningful investigation and failed to put on any evidence at the penalty phase."  This is simply not true.  In *Howard II*, as required by Miss. Code Ann. § 99-19-105, we evaluated the proportionality of the death penalty.

21

*Howard II*, 853 So. 2d at 797-99.  We found that "[n]one of the Miss. Code Ann. § 99-19-101(b) mitigating circumstances are present."  *Id.* at 798.  We then stated,

> Howard also presented no evidence in mitigation.  He responded to the trial judge's instruction that he had the right to testify during the sentencing phase if he wished to do so.  Howard responded, "Your Honor, I understand by the law that [ ] the prosecutor supposed to prove all three element of the crime.  He didn't prove anything, no DNA, no nothing.  So [ ] I don't see no reason for me to say anything further.  My lawyers have did the best possible job."  Attorney Kesler also obtained a short recess to go search for Howard's mother and sister who had attended the beginning of the trial.  After Kesler was unable to locate Howard's family, the trial judge stated, "since there is to be no proof and evidence presented by the defense either, are you still of a mind that you do not need to make an opening statement to tell the jury what your proof and evidence might consist of?"  Howard responded, "That's correct."
>
> We do not find that Howard's counsel's failure to provide evidence in mitigation to be constitutionally ineffective assistance of counsel.  The Fifth Circuit has held that "[t]he failure to present a case in mitigation during the sentencing phase of a capital trial is not, per se, ineffective assistance of counsel.  This court has often upheld decisions not to put on mitigating evidence where the decision resulted from a strategic choice."  *Stringer v. Jackson*, 862 F.2d 1108, 1116 (5th Cir. 1988), *vacated and remanded sub nom. on other grounds*, *Stringer v. Black*, 503 U.S. 222, 112 S. Ct. 1130, 117 L. Ed. 2d 367 (1992).  *See Williams v. Cain*, 125 F.3d 269, 277 (5th Cir. 1997) (quoting *Stringer*); *Williams v. State*, 722 So. 2d 447, 450 (Miss. 1998) (citing *Williams v. Cain*); *see also McGilberry v. State*, 843 So. 2d 21, 30 (Miss. 2003).  It is clear that defense counsel wished to have Howard's mother and sister testify in mitigation.  The inability to locate them may evidence a want of preparation on defense counsels' part; however, it is plain from the record that Howard did not want them to testify.  In response to Kesler's announcement of his plan to call Howard's mother and sister, Howard stated, "They-they won't be here.  They-they know every-the whole story."  Other than family members, there

22

> is nothing else in the record or even suggested by the record of any potential mitigating evidence.

*Howard II*, 853 So. 2d at 798-99 (emphasis added). We <u>did not note</u> "that petitioner's counsel failed to conduct any meaningful investigation and failed to put on any evidence at the penalty phase." Howard additionally asserts that we "applied incorrect legal principles and prevailing professional standards to the facts of the case and failed to follow the ABA Guidelines as they apply to counsel's duty to investigate thoroughly." As in *Byrom*, Howard

> asserts no specific ground of [his] trial counsel's ineffective assistance, but instead makes the general assertion that *Wiggins* somehow changes the procedure for appellate review of ineffective assistance of counsel claims pursuant to *Strickland*. We disagree and thus find this issue to be without merit.

*Byrom*, 927 So. 2d at 717. We find that this issue is procedurally barred by the doctrine of res judicata. *See* Miss. Code Ann. § 99-39-21(3). Additionally, and without waiving the bar, this issue has no merit and Howard is not entitled to any relief as to this issue.

### C. The alleged failure of Petitioner's counsel to conduct an adequate investigation (guilt phase)

#### 1. State material witness Kayfen Fulgham

¶34. Howard asserts that his trial counsel failed to conduct an adequate investigation into the guilt phase of the trial. Howard's basis for this particular argument is that Kayfen Fulgham allegedly gave perjured testimony at Howard's trial. Howard apparently contends that by conducting an adequate investigation, trial counsel would have known of Fulgham's bias and credibility issues and would have done a better job cross-examining her.

23

¶35. The record reveals that Fulgham and Howard had a romantic relationship in the early 1970s. Fulgham and Howard are the parents of a daughter named Kathy. At trial, Fulgham testified that she and Howard had another romantic relationship which lasted a couple of months and ended at the end of January 1992. She testified that Howard liked to bite her breasts and neck during sexual intercourse. She testified that she did not see Howard on the day of the murder, but she did see him around 10:00 a.m. on the day after the murder. She testified that he smelled like smoke and it was "wood like smoke."

¶36. Howard now contends that Fulgham's testimony was perjured and that this perjured testimony was the result of "knowing and deliberate coercive efforts by the Lowndes County District Attorney [Allgood] and [police investigator] David Turner." In support of these allegations, Howard offers the affidavit of Robert Ryan, Director of the MOCPCC. Ryan states that he has interviewed Kathy, Howard's daughter, twice. Ryan's affidavit states, in pertinent part,

> Kathy was asked by the affiant if Fulgham had ever discussed with her the petitioner's case and her live testimony at the trial. Kathy responded in the affirmative and informed the affiant that [Fulgham] had told her that she had been threatened by District Attorney Forrest Allgood and if she did not testify as he had directed her to, he would have her arrested and locked up. Kathy further stated that Fulgham told her that District Attorney Allgood and then Investigator David Turner were in possession of a "tape recording" that they would use against her if she did not testify as directed. The gist of Kathy's statement to the affiant was that Fulgham had offered untruthful testimony regarding material matters at the petitioner's trial.

\* \* \*

24

> The affiant requested of Kathy that she provide the affiant with an affidavit stating the substance of her conversations with Fulgham but she refused to do so. The reason given for her refusal was her fear of reprisals from District Attorney Forrest Allgood and unnamed members of the Columbus Police Department.

Howard further states that Fulgham has refused to talk or meet with his post-conviction counsel to discuss her testimony.[10]

¶37. As further proof that Fulgham's testimony was false, Howard offers his own affidavit in which he states that he saw Fulgham at a get-together at his sisters' home on the night of the murder,[11] that he did not see Fulgham on February 3, 1992, and that he did not smell like smoke of any kind. Howard also offers the affidavits of two of his sisters, his sisters' statements given to police during the investigation of the crime, his nephew's affidavit, and Yolanda Wells' statement to police. Each of these documents discuss the get-together at the sisters' apartment. All of these documents state that Howard was at the get-together. All, but Wells' statement, also state that Fulgham stopped by the apartment during the get-together and spoke with Howard.

¶38. In response, the State offers the affidavits of Allgood and David Turner. In his affidavit, Allgood states, in pertinent part,

---

[10]Kathy's alleged statements to Ryan are hearsay and do not meet any exception. Howard also cites what he calls an "evidence log" which lists "video, drawing, cast-teeth, photos 1-box." Howard asserts that this is the tape recording to be used against Fulgham. This video is just as likely to be the video of the crime scene which was discussed in issue I. D. Howard's efforts to depose Kathy and Fulgham are discussed in issue IV.

[11]Howard's alibi witnesses will be discussed in the next issue.

25

at some time subsequent to that date, Kathy . . . appeared at my office. . . . [Kathy] was quite irate and told us that "that man" had been harassing her mother. She related that "these people" were telling her mother that she, [Kathy], would be arrested if she didn't talk to them. When we questioned her about what "man" that might be, she told us that it was "that lawyer" for Eddie Lee Howard.

* * *

I have never at any time threatened a witness. It is asserted in the Petition that I did so to compel Kayfen Fulgham to testify. Specifically, it is alleged that I threatened her with prosecution and waived some videotape in front of her as if it were evidence. That simply never happened.

In his affidavit, Turner states, in pertinent part,

During the course of this investigation, it was learned that . . . Fulgham had relative information regarding this case. I personally interviewed . . . Fulgham on several occasions in the presence of other Columbus Police Department Detectives. These interviews were conducted at the Columbus Police Department, the Lowndes County Court House, and at the home of Ms. Fulgham. Ms. Fulgham's interviews were given of her own free will and without any pressures, threats, or coercion. At no time was Ms. Fulgham threatened to be arrested and/or locked up if she refused to testify as directed by [Allgood] and/or others against Eddie Lee Howard. Furthermore, a "tape recording" was never utilized against Ms. Fulgham indicating that if she did not testify as directed, it would be used against her.

¶39. The State additionally argues that even if Fulgham's testimony was false, that does not support a finding of ineffective assistance of counsel. The State offers trial counsel Kesler's affidavit as support. In his affidavit, Kesler states that he was aware of Fulgham as a witness prior to Howard's first trial and he prepared for her testimony before the second

26

trial. He admits that his strategies to attack her testimony did not work very well. His affidavit further states, in pertinent part,

> I have no knowledge of the allegation that Fulgham was coerced by David Turner and Forrest Allgood. My opinion is that such an allegation is absurd. My recollection is that by the time of the second trial, David Turner was employed by a federal law enforcement agency and was not living in Columbus, Mississippi, and traveled from out of state to testify at the second trial. Assuming that coercion was employed, I am at a loss to know how I would have discovered same.

¶40. In order to prove ineffective assistance of counsel, Howard must show that his counsels' performance was deficient and that such deficiency prejudiced his defense. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. Howard cannot prove that counsels' failure to discover alleged coerced perjured testimony was deficient performance. Accordingly, the petition is denied as to this issue.

### 2. The Petitioner's defense of alibi

¶41. Howard asserts that he has a credible alibi defense, that he informed his trial counsel of this defense, and that he informed counsel that numerous people were willing testify in his behalf regarding this defense. Howard argues that his trial counsel rendered ineffective assistance of counsel by failing to investigate this alibi defense and by failing to present this defense at trial.

¶42. Assuming, for the moment, that Howard's trial counsel did not properly investigate this defense, (a point which the State vehemently denies), we find that the affidavits and statements Howard offers do not actually provide him with an alibi for the crime. The record from the second trial reveals that the arson investigator determined that the two fires in

27

Kemp's living room smoldered between four to six hours. The fires were extinguished by the fire department after 8:30 p.m. and before 9:00 p.m. Accordingly, it may be inferred that the fires were set after 2:30 p.m. and before 5:00 p.m.

¶43.  The affidavits and statements offered by Howard allege the following:

> Howard was at a gathering at his sister's home on February 2, 1992. (Howard's affidavit dated September 10, 2004).

> There was a get-together at Gloria's house. Howard was there and they all watched a movie. "It wasn't dark, dark when [Howard] came to the get-together. I wasn't watching my watch to see what time it was. We were cooking and watching a movie." (Pearlie Mae Howard's affidavit dated September 12, 2004).

> Sometime after 1:00 p.m. on February 2, 1992, Pearlie saw Howard at their mother's home. "About 5:30 p.m. to 6:00 p.m." Howard came over to Pearlie and Gloria's home. Howard stayed "until about 10:00 p.m." (Pearlie Howard's statement to police dated February 8, 1992).

> Gloria and Pearlie had a get-together at their apartment on a Sunday and Howard was there. Howard left for about five minutes to go to the store. They were watching movies. (Gloria Jean Wilkins' affidavit dated September 14, 2004).

> "On or about" February 2, 1992 Gloria had unexpected company at her apartment to watch a movie. Howard was there. Howard arrived "around 5:00 to 6:00 p.m. When [Howard] got here it hadn't got dark yet." Howard left around 10:00 p.m. (Gloria Wilkins' statement to police dated February 12, 1992).

> Duron Pyle was at a get-together at Gloria's house. When he left at 9:15 p.m., Howard was still there. "It was semi dark when [Howard] arrived at the get-together." (Duron Pyle's affidavit dated September 13, 2004).

28

"The Sunday before last I was over at [Gloria] Wilkins apartment with Duron Pyles. It was around 8:00 p.m. when we got there." Howard was already at the get-together when they arrived. They left around 10:00 p.m. and Howard was still there when they left. (Yolanda Wells' statement to police).

Accordingly, at most, these affidavits and unsworn statements allege that Howard was at Gloria and Patsy's apartment for a get-together on February 2, 1992. Howard arrived, at the earliest, "around 5:00 to 6:00 p.m." Since the fires were set after 2:30 p.m. and before 5:00 p.m., these statements and affidavits do not provide Howard with an alibi for the crime.[12] Even if Howard could prove that his attorneys' performance was deficient, which the State denies, Howard cannot show how that deficient performance prejudiced his defense. Howard cannot meet the prejudice prong of **Strickland**, and the petition is denied as to this issue. **Strickland**, 466 U.S. at 687, 104 S. Ct. at 2064.

### 3. Expert opinion testimony of Dr. David Curtis

¶44. Howard argues that his trial counsel "neglected to voir dire Dr. Curtis as to his qualifications to render . . . expert opinion testimony and further neglected to cross-examine him following direct examination by the State." Howard then states that "it was obvious that Dr. Curtis did not accurately prepare the impressions/molds at issue." Howard contends that this was constitutionally ineffective assistance of counsel.

¶45. As is discussed more thoroughly in issue V, Howard has completely failed to prove that Dr. Curtis was unqualified to prepare Howard's dental molds or that there was something

---

[12]These affidavits, as well as testimony in the record, reveal that the sisters' apartment was just a few blocks from Kemp's home and Howard arrived at the apartment on a bicycle.

29

actually wrong with those molds or the manner in which they were made. In fact, the record reflects the contrary. We have consistently held,

> When evaluating the overall performance of counsel, it must be considered that counsel makes strategic discretionary decisions including whether or not to file certain motions, call certain witnesses, ask certain questions, or make certain objections. *See Cole v. State*, 666 So. 2d 767, 777 (Miss. 1995). There is also a strong presumption that the attorney's performance was within the wide range of reasonable, professional, and acceptable conduct. *See Leatherwood v. State*, 473 So. 2d 964, 968-69 (Miss. 1985).

*Underwood v. State*, 919 So. 2d 931, 940 (Miss. 2005). We find that counsels' decisions regarding the examination of Dr. Curtis were trial strategy. Howard cannot meet both prongs of *Strickland*, and the petition is denied as to this issue. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064.

### 4. Whether trial counsel was ineffective in not obtaining a bitemark expert to debunk the testimony of Dr. Michael West.

¶46. Howard argues that his trial counsel failed to present expert testimony to rebut the testimony of Dr. West and this failure constituted constitutionally ineffective assistance of counsel. This is the first of four issues in which Howard attacks the bite mark evidence used against him at trial and Dr. West's expert opinion.[13] On direct appeal, Howard was allowed to file a pro se supplemental brief in addition to the brief filed by his appellate counsel. On direct appeal, Howard argued that his trial counsels' failure to retain an expert in forensic odontology to rebut the State's expert was constitutionally ineffective assistance of counsel. In discussing the issue, we stated,

---

[13]See also the discussions of issues XII, XIII, and XVI.

The first argument Howard raises in his pro se brief is the ineffectiveness of his trial counsel. The specific instance of ineffective assistance, according to Howard, was his counsel's failure to retain an expert in forensic odontology to rebut Dr. West's testimony. However, Kesler and Walters did consult with a Dr. Richard Souviron in anticipation of Howard's first conviction being reversed. Dr. Souviron indicated that he would probably concur in Dr. West's findings because of Howard's partial upper denture and the fact that Kemp's body was never exposed to the elements. Howard's attorneys made the tactical decision not to call Dr. Souviron because, according to Kesler, "we didn't want to take the risk of giving the State another expert and an expert that in my opinion [was] more credible than Doctor West. . . ."

*Howard II*, 853 So. 2d at 796. We specifically found that Howard failed to "establish both deficient performance and prejudice," *id.* at 797, and that counsels' decision not to obtain an expert to be sound trial strategy. *Id.*

¶47.   In discussing this issue on direct appeal, we relied on statements made by Kesler in the trial transcript. Kesler explained to the circuit court, outside the presence of the jury, why the defense was not offering testimony from an expert witness. Kesler stated the following:

> Your Honor, may I, uh, uh, put another matter in the record? Uh, Doctor West in his cross examination made mention of the fact that, uh, if the defense wanted to get an expert and question his findings, we were free to do that. Uh, in fact, uh, the first case I had asked the Court to appoint such an expert, uh, and the Court had, uh, been willing to do that is my recollection, uh, but we never got that far because that would have necessitated a continuance and Mr. Howard elected to take over his defense at that point. Uh, he was convicted, as I recall, in May of nineteen ninety-four. During that same time period I was defending a man named Kennedy Brewer and the Court had allowed me to have funds to obtain a forensic odontologist for the defense and that was a gentleman by the name of Doctor Tom Krauss. Uh, literally about maybe a week before that case had been set for trial in the very early part of January, nineteen ninety-five,

Doctor Krauss was killed in a car accident. The Court then allowed me to replace Doctor Krauss and we obtained the services of Doctor Richard Souviron, the same Doctor Souviron that was discussed in testimony here. Now at that point Mr. Howard had already been convicted, but in anticipation, uh, of perhaps the case being reversed or for whatever reasons, I--myself and Mr. Walters, while Doctor Souviron was here in March of nineteen ninety-five, we did discuss this case with him. Uh, he advised us that he would look at this case, but he also cautioned us that should he examine the material, he--his prediction was that he would probably concur with Doctor West's findings and he pointed out two things, that here the denture or the partial plate was involved as opposed to natural teeth, and that put it a little closer to the, uh, tool mark field, and he also distinguished, uh, this case by the fact that Mrs. Kemp's body was not exposed to the elements. Uh, if the Court recalled, in the Brewer case and many of these cases, the body had been out in the, uh, open, uh, sometimes sloughs, I know the Harrison case from the gulf coast that was discussed, that was like that, uh, and based on that, uh, we made the decision--well also, let me throw in this, Doctor Souviron, uh, is primarily a law enforcement witness and he, uh, told us that of course if his findings, uh, were averse that he would of course advise the State and what we decided was that we didn't want to take the risk of giving the State another expert and an expert that in my opinion, uh, more credible than Doctor West, and that explains why we--I hope explains why we have no expert.

(emphasis added). Kesler and the trial court also discussed the fact that the circuit court was more than willing to grant a motion for funds to employ an expert witness. Additionally, the trial court noted that Dr. Souviron has excellent credentials and is held in very high regard in his field.

¶48. In his petition for post-conviction relief and his reply to the State's response, Howard now offers affidavits from Dr. Souviron which call into question Kesler's statements to the trial court. Howard alleges that Kesler "intentionally and deliberately misled the trial court"

32

and that Howard's pro se claim on direct appeal "was unfairly discounted by the Mississippi Supreme Court in reliance upon Kesler's false representations to the trial court."

¶49.   The State argues that this issue is barred by the doctrine of res judicata.[14]   We disagree.  Howard was represented on direct appeal first by Kesler, then by Walters and Gary Goodwin.  Realistically, Dr. Souviron's affidavits were not reasonably discoverable until Howard was appointed new counsel.  Dr. Souviron's affidavits constitute newly discovered evidence, which except this issue from the procedural bar.[15]

¶50.   Howard offers two affidavits from Dr. Souviron, in which Dr. Souviron states that he has reviewed the transcript of Dr. West's trial testimony, the above statements by Kesler to the trial court, and Kesler's affidavit in support of the State's response.  In his first affidavit, Dr. Souviron states, in pertinent part,

> that without me seeing the material, Mr. Kesler states that "prediction was that he (Souviron) would probably concur with Dr. West's finding".  This is not an accurate statement.  In fact, in the year 1995 I had disagreed with Dr. West on both the Brewer and the Brown case. . . . [I]t is true that the maxillary four anterior teeth were missing and a denture was in place in Mr. Howard's upper jaw.  Mr. Kesler should know that a partial denture is custom made and not "manufactured".  Secondly, a partial denture leaves a bite mark indistinguishable from natural

---

[14]"The doctrine of res judicata shall apply to all issues, both factual and legal, decided at trial and on direct appeal."  Miss. Code Ann. § 99-39-21(3).  Howard does not discuss the State's claim of procedural bar.  "The Petitioner carries the burden of demonstrating that his claim is not procedurally barred."  *Jackson v. State*, 860 So. 2d 653, 661 (Miss. 2003) (quoting *Lockett v. State,* 614 So. 2d 888, 893 (Miss. 1992) (citations omitted)).

[15]"Errors affecting fundamental constitutional rights may be excepted from procedural bars which would otherwise prohibit their consideration."  *Luckett v. State*, 582 So. 2d 428, 430 (Miss. 1991) (citing *Smith v. State*, 477 So. 2d 191, 195-96 (Miss. 1985)).

teeth. Therefore the "partial denture is closer to a tool mark" is not an accurate statement. . . . [A]s apposed to the Brewer case or the Harrison case, Ms. Kemp's body was not exposed to "the elements" is a true statement. However, she had been decomposing for five days, was exhumed and un-embalmed, <u>surely this would have been a factor in even diagnosing a bite mark much less making any kind of a comparison</u> to Mr. Howard's teeth. . . . The statement that I am "primarily a law enforcement witness" is a <u>gross mischaracterization of the truth</u>. The fact of the matter is, I testified on behalf of the defense in [several cases]. I consider myself an expert for the truth in evaluating pattern injuries, specifically bite marks. . . . <u>I would never advise the opposing side of my opinion unless I was subpoenaed, deposed under oath or ordered by the court to produce my opinion.</u>

(emphasis added). In response, the State offers Kesler's affidavit, which states, in pertinent

part,

With respect to the decision not to seek a defense expert in the field of forensic odontology, a portion of the reasoning is set out in the record of the second trial. The assertions of Howard's counsel, Ryan, that my statements are a deliberate falsehood are at best a reckless disregard for the truth and at worst a deliberate personal attack on me that has no basis in fact. . . . I did use Dr. Richard Souviron as a defense expert in defending another, unrelated, defendant's case in which Dr. Michael West was the expert for the State. Souviron traveled to Columbus, Mississippi, to testify on behalf of that defendant, Kennedy Brewer. While Souviron was in Columbus, I consulted him about the Howard case, and the results of my understanding of that consultation are contained in the second trial record. At the time in question, Souviron was less than enthusiastic about testifying on behalf of defendants. . . . Despite this intense preparation, at the Brewer trial Souviron was not effective in rebutting the testimony of Michael West. Souviron expressed great respect of Michael West after I had spent hours in confronting West in *voir dire* with West's obvious lack of expertise and total lack of professionalism. The Brewer jury totally rejected the testimony of Souviron.

In Howard's reply to the State's response, he offers a second affidavit from Dr. Souviron in which Dr. Souviron states, in pertinent part,

> Mr. Kesler's "casual consultation" regarding the Howard Case while I was in Columbus preparing to testify in the Brewer case was exactly that. <u>There were no models, no bite impressions, no scene photographs or any other documentation that would lend itself to providing a accurate complete thorough and comprehensive evaluation of a bite mark case.</u> . . . At the time of the "casual consultation" regarding the Howard case while I was in Columbus preparing for the Brewer case I had previously testified several times for the defense and had given opinions favorable to the defense when hired by the prosecution. . . . <u>Had I been retained by Mr. Kesler, I would have been able to provide proper background information to voir dire Dr. West. . . . Dr. West's statements during voir dire were either half true or misleading.</u> If the facts had been known, Mr. Kesler would have been able to prove "the spin" Dr. West's placing on his expulsion from ABFO, the American Academy of Forensic Sciences and the International Association of Identification. . . . I never saw the pattern injuries on Ms. Kemp's body. . . . [T]he pattern injuries that were interpreted as bite marks by Dr. West <u>were not bite marks</u> in the Keko case, the Brewer case, the Brown case, or the Harrison case. . . <u>Had Mr. Kesler provided me with the necessary background information, photographs, models, impressions, bite records, etc. I would have been able to provide a proper evaluation in the Eddie Lee Howard case.</u> . . . . Had Mr. Kesler asked, I would have been able to provide background information that Mr. Kesler was not aware of with regard to Dr. West's qualifications, Dr. West's reasons for suspension from the American Board of Forensic Odontology. <u>This background information would have been extremely helpful, in my opinion, to Mr. Kesler in the voir dire of Dr. West</u>.

(emphasis added).

¶51. On direct appeal, we relied on Kesler's statements to the circuit court that Dr. Souviron would probably agree with Dr. West's opinion and that Dr. Souviron would provide

to the State any findings adverse to Howard. Based on Dr. Souviron's affidavits, those statements were not true. Accordingly, we must again determine if the failure to present testimony from an expert witness constituted constitutionally ineffective assistance of counsel.

¶52. In order to prove ineffective assistance of counsel, Howard must "demonstrate that his counsel's performance was deficient and that the deficiency prejudiced the defense of the case." *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. We find that the failure to call an expert witness was deficient performance.[16] However, we also find that Howard has not proven prejudice to his defense; and therefore, Howard has not proven that he received constitutionally ineffective assistance of counsel.

¶53. In order to prove prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068; *see also Mohr v. State*, 584 So. 2d 426, 430 (Miss. 1991). Accordingly, in order for Howard to show that the result of the proceeding would have been different, he must offer an affidavit from an expert witness who rebuts the State's expert testimony. For example, the expert might opine that Kemp did not have any injuries at the locations where Dr. West found bite marks,

---

[16]The only evidence linking Howard to the crime was his alleged statement to Detective Turner that the case was "solved" and the bite mark identification. In *Howard I*, this Court pointed out concerns regarding the reliability of bite mark identification and gave counsel guidance on how to defend against such evidence, including the use of expert testimony. *Howard I*, 701 So. 2d at 287-88. Defense counsel should have called an expert witness to rebut Dr. West's testimony.

36

or that the marks Dr. West found were not human bite marks, or that the expert has compared Howard's teeth to the injuries and Howard could not have been the biter. In support of his post-conviction claim, Howard has offered numerous expert affidavits and other documents which attack Dr. West, his testimony, and bite mark evidence in general. These affidavits and other documents point out how many times Dr. West has been proven wrong and they discuss how unscientific his methods are. One affidavit even states that Dr. West made a mis-diagnosis in Howard's case, but, it does not go on and opine that Howard did not bite Kemp. Just because Dr. West has been wrong a lot, does not mean, without something more, that he was wrong here. Howard has failed to sufficiently prove that there is "a reasonable probability" that the "result of the proceeding would have been different." *Id.* Howard has not proven prejudice to his defense and the petition is denied as to this issue.

### D. The alleged ineffective assistance of counsel (sentencing phase)

#### 1. The alleged failure of Petitioner's counsel to conduct an adequate investigation

¶54. Howard again argues that his trial counsel failed to conduct an adequate investigation during the sentencing phase and that this was constitutionally ineffective assistance of counsel. As discussed above in issue II. B., we addressed this issue on direct appeal and found, in pertinent part,

> We do not find that Howard's counsel's failure to provide evidence in mitigation to be constitutionally ineffective assistance of counsel. The Fifth Circuit has held that "[t]he failure to present a case in mitigation during the sentencing phase of a capital trial is not, per se, ineffective assistance of counsel. This court has often upheld decisions not to put on mitigating evidence where the decision resulted from a strategic

37

choice." ***Stringer v. Jackson***, 862 F.2d 1108, 1116 (5th Cir. 1988), *vacated and remanded sub nom. on other grounds*, ***Stringer v. Black***, 503 U.S. 222, 112 S. Ct. 1130, 117 L. Ed. 2d 367 (1992). *See **Williams v. Cain***, 125 F.3d 269, 277 (5th Cir. 1997) (quoting ***Stringer***); ***Williams v. State***, 722 So. 2d 447, 450 (Miss. 1998) (citing ***Williams v. Cain***); *see also **McGilberry v. State***, 843 So. 2d 21, 30 (Miss. 2003). It is clear that defense counsel wished to have Howard's mother and sister testify in mitigation. The inability to locate them may evidence a want of preparation on defense counsels' part; however, it is plain from the record that Howard did not want them to testify. In response to Kesler's announcement of his plan to call Howard's mother and sister, Howard stated, "They-they won't be here. They-they know every-the whole story." Other than family members, there is nothing else in the record or even suggested by the record of any potential mitigating evidence.

***Howard II***, 853 So. 2d at 798-99 (emphasis added). This issue is procedurally barred by the doctrine of res judicata. *See* Miss. Code Ann. § 99-39-21(3) (Rev. 2000). "Rephrasing direct appeal issues for post-conviction purposes will not defeat the procedural bar of res judicata. The Petitioner carries the burden of demonstrating that his claim is not procedurally barred."

***Jackson***, 860 So. 2d at 660-61 (quoting ***Lockett***, 614 So. 2d at 893 (citations omitted)).

¶55. Without waiving the procedural bar, this issue also fails on the merits. Howard alleges that his trial counsel failed to conduct any investigation of his background for mitigation purposes. He asserts that had counsel interviewed his family, investigated his background, and presented this evidence during the sentencing phase, the outcome would have been different. Citing ***Wiggins v. Smith***, Howard states that this failure was due to intentional neglect and not based on trial strategy. In support of his allegations, he offers the affidavits of his mother and two sisters. In their affidavits, each state that Howard: (1) had been a good and obedient child and had a good childhood; (2) enjoyed going to church with

38

their mother and was kind and loving to his family; (3) was very helpful, especially to their mother, and they could depend on him to help them when needed; and (4) liked to be neat and clean. Howard's sister, Pearlie Mae Howard, also stated in her first affidavit that

> [t]he trial attorney never called me or talked to me. I was never asked anything. My brother had his own paperwork done for us to be at court. I never talked to an attorney for either round. I would have testified on Eddie's behalf if I'd been asked. . . . I never talked to his second attorneys either. During the second trial, I was called to the stand one time . . . I told him I didn't want to be involved because I really didn't know that much. . . .[17] I never knew Eddie to be violent or have a mean streak. I can only speak for what I know and I never saw anything like that out of Eddie.

In her second affidavit, Pearlie Mae Howard also stated that she did not believe that Howard had killed anyone and "[i]f he has that mean streak in him, I've never seen it." Howard's sister, Gloria Jean "Patsy" Wilkins stated in her affidavit that

> No attorney, before or during any trial, contacted me. I tried to talk to the attorney during the second trial, but they'd just walk off. The didn't let the family know anything. When he was doing his own trial, Eddie had us on his list to testify for him. . . . If I'd been asked, I would have testified on Eddie's behalf. The family would have testified for him. . . . They asked questions but didn't seem to ask the right ones. As far as I know Eddie and his family were the only ones questioned.

Finally, Howard's mother, Lizzie Mae Howard, stated that "Eddie was never violent."

¶56. In response, the State offers Kesler's affidavit. Kesler states, in pertinent part,

> I talked with Howard in detail about how his defense would be presented in the second trial. . . . Howard called some of these witnesses to testify at his first trial. None of the witnesses had testimony favorable to Howard or relevant to any defense.

---

[17]Pearlie Howard testified in the first trial, not the second trial.

39

These witnesses included his mother and sister. . . . Based on my personal observations of both of these women in Howard's first trial, I discounted any substantial or material value in their testimony for either phase of his second trial; however, because of the complete void of any mitigating circumstances in the life of Howard or in the facts of the murder of Ms. Kemp, I determined that the only option at a sentencing phase would be to have the family literally beg the jury not to execute Howard. I was assured by Eddie Lee Howard that his mother and sister would do so. I also felt that if they exhibited the same strange appearance from the first trial, the jury might dredge up some sympathy for Howard. I had no expectation that they would fail to cooperate by leaving the courthouse and not be present for the sentencing phase. I learned that they had left only when we attempted to call them to the courtroom.

Additionally, the State points out that "it is plain from the record that Howard did not want [his family] to testify." *Howard II*, 853 So. 2d at 799.[18]

¶57.    Howard contends that his trial counsel were ineffective pursuant to *Wiggins v. Smith*. We have consistently held that the "failure to present a case in mitigation during the sentencing phase of a capital trial is not, per se, ineffective assistance of counsel." *Williams*, 722 So. 2d at 450 (citing *Williams v. Cain*, 125 F.3d at 277); *Gray v. State*, 887 So. 2d 158, 167 (Miss. 2004). It has also been consistently held that

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's

---

[18]Howard argues that "[t]he investigation for preparation of the sentencing phase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered." ABA *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*, Guideline 11.4.1(C). However, this Court has held that counsel is not ineffective for failing to present evidence in the sentencing phase, pursuant to the client's instructions. *Bishop*, 882 So. 2d at 145 (citing *Clark v. Johnson*, 227 F.3d 273, 283-84 (5th Cir. 2000), *cert. denied* 531 U.S. 1167, 121 S. Ct. 1129 (2001)).

> defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. *Cf. Engle v. Isaac*, 456 U.S. 107, 133-134, 102 S. Ct. 1558, 1574-1575, 71 L. Ed. 2d 783 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." *See Michel v. Louisiana*, supra, 350 U.S., at 101, 76 S. Ct., at 164. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. See Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. Rev. 299, 343 (1983).

*Strickland*, 466 U.S. at 689-90, 104 S. Ct. at 2065-66; *Stringer*, 454 So. 2d at 477.

Additionally, the facts of *Wiggins v. Smith* are clearly distinguishable. Wiggins "was starved, neglected, beaten, abused, and raped for most of his childhood, and he had a diminished mental capacity. Despite all of that, Wiggins had no criminal history prior to the murder." *Bishop*, 882 So. 2d at 146 (citing *Wiggins*, 123 S. Ct. at 2533, 2537). From the affidavits submitted by Howard, he had a normal, happy childhood. Additionally, Howard had a violent criminal background.

¶58. We find that if Howard's family had testified that Howard was a great person and had never been violent, then the State could have presented evidence to the jury regarding Howard's convictions for assault with intent to ravish and assault with intent to ravish and rape. *See Powers v. State*, 883 So. 2d 20, 35 (Miss. 2003) ("Further, as to mitigation

41

evidence, the State would have been allowed to rebut such evidence through cross-examination, introduction of rebuttal evidence, and in its closing argument to the jury."). In view of the deferential standard that we must apply, trial counsel's affidavit, and the fact that it appears that Howard's counsel did all they could within the limitations placed on them by Howard, we find that not only is this issue barred by res judicata, Howard "has not submitted sufficient evidence of a breach of the duty of counsel to investigate and present mitigation evidence as described by the United States Supreme Court in *Wiggins v. Smith*." *Simmons v. State*, 869 So. 2d 995, 1004 (Miss. 2004). Howard cannot meet both prongs of *Strickland*, and the petition is denied as to this issue. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064.

### 2. Whether trial and appellate counsel were ineffective in that they failed to challenge the use of the "avoiding arrest" aggravating circumstance.

¶59. Howard argues that his trial and appellate counsel rendered constitutionally ineffective assistance in failing to challenge the use of the "avoiding arrest" aggravating circumstance. As is discussed in issue X, there was sufficient evidence for the jury to "reasonably infer[] that a substantial reason for the killing was to conceal the identity of the killer . . . or to 'cover [his] tracks' so as to avoid apprehension and eventual arrest by authorities." *Hodges v. State*, 912 So. 2d 730, 786 (Miss. 2005) (quoting *Brown v. State*, 682 So. 2d 340, 355 (Miss. 1996)). "Because we have held that the underlying claims are without merit, [Howard] cannot show the requisite deficient performance and resulting prejudice necessary to establish the various claims of ineffective assistance of counsel." *Walker v. State*, 863

So. 2d 1, 11 (Miss. 2003). Howard cannot meet both prongs of *Strickland*, and the petition is denied as to this issue. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064.

> 3. **Whether trial counsel failed to object and preserve for appeal improper comments made by the prosecutor during the closing argument.**

¶60. The record reveals that during closing arguments in the sentencing phase of the trial, Howard's defense counsel argued that the jury should sentence Howard to life in prison. Defense counsel argued that such a sentence would mean that Howard would die in prison. In response, the District Attorney stated, in pertinent part, "what counsel says in some respects is true. He, provided he does not escape or something else, he will die in the penitentiary if he gets life in this case." Howard now argues that the prosecutor's comment denied him a fair trial and his trial counsels' failure to object to the comment constituted constitutionally ineffective assistance of counsel.

¶61. We have previously rejected a similar argument. In *Brewer v. State*, 725 So. 2d 106 (Miss. 1998), defense counsel similarly argued that a life sentence would mean that Brewer would spend the rest of his life in the maximum security unit at Parchman and would never get out. In response, the District Attorney argued that "[t]here is always the possibility that he might escape. . . ." *Id.* at 131. In finding this argument to be without merit, we held,

> Evaluating the remarks in context and taking into consideration the circumstances of the case in deciding the propriety of the comments, *Ahmad v. State*, 603 So. 2d 843, 846 (Miss. 1992), the test is whether the natural and probable effect of the improper argument created an unjust prejudice against the accused as to result in a decision influenced by the prejudice so created. *Davis v. State*, 530 So. 2d 694, 701 (Miss. 1988).

43

> While prosecutorial speculation about the possibility of escape has no place in closing argument in the penalty phase, especially where there is no proof of a relevant history on that issue, we are not persuaded that the comments here were of such a character or substance that Brewer's right to a fair trial was compromised or that the jury's verdict of death was based upon the consideration of the possibility of escape.

*Id.* at 132. We find that the District Attorney's comment was not of "such a character or substance that [Howard's] right to a fair trial was compromised." *Id.*

¶62. Howard also makes a very brief argument that the prosecutor "rambled on and on about his experiences" during closing argument. Howard contends that this rambling had no relevance to the issues, that trial counsel failed to object, and their failure to object constituted ineffective assistance of counsel. Since Howard fails to support this argument with any authority, we do not have to consider it. *See Bell v. State*, 879 So. 2d 423, 434 (Miss. 2004). Without waiving the bar, the underlying claim is without merit. The record reveals that the prosecutor did not "ramble on and on" and the comment was a response to the previous argument of defense counsel.

¶63. We find that defense counsel did not object during the prosecutor's closing arguments because of sound trial strategy. Defense counsel Kesler's affidavit states, in pertinent part,

> Finally, I did not interpose an objection to the District Attorney's comments in closing wherein he noted that Howard might escape. I have always hesitated to make objection during opposing counsel's closing arguments for fear of highlighting the offending argument and giving it more exposure in arguing any such objection to the trial court. I employed that reasoning in the Howard case. In light of the entire context of closing arguments for both sides, I felt then and still do, that the comment had little or no effect on the jury in light of the

evidence of the background of Eddie Lee Howard that was properly presented to the jury.

The decision to "make certain objections fall[s] within the ambit of trial strategy and cannot give rise to an ineffective assistance of counsel claim." *Powell v. State*, 806 So. 2d 1069, 1077 (Miss. 2001) (quoting *Cole*, 666 So. 2d at 777). Howard cannot meet both prongs of *Strickland*, and the petition is denied as to this issue. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064.

### 4. Whether trial counsel was ineffective for failing to challenge the "during the commission of arson" aggravating factor.

¶64. Howard asserts that "[t]rial counsel and appellate counsel were ineffective in the failure to challenge the use of the arson aggravator and preservation of the error for direct appeal." As in issues VII and VIII, Howard contends that the aggravating circumstance that the murder was committed during the commission of arson should not have been submitted to the jury because the aggravating circumstances were not included in the indictment. Therefore, Howard argues that trial counsel and appellate counsels' failure to challenged the submission of this aggravating circumstance was constitutionally ineffective assistance of counsel.

¶65. As is discussed in issues VII and VIII below, we have has consistently held that "a defendant is not entitled to formal notice of the aggravating circumstances to be employed by the prosecution and that an indictment for capital murder puts a defendant on sufficient notice that the statutory aggravating factors will be used against him." *Stevens v. State*, 867 So. 2d 219, 227 (Miss. 2003) (citing *Smith v. State*, 729 So. 2d 1191, 1224 (Miss. 1998);

45

*Williams v. State*, 445 So. 2d 798 (Miss. 1984)). "Because we have held that the underlying claims are without merit, [Howard] cannot show the requisite deficient performance and resulting prejudice necessary to establish the various claims of ineffective assistance of counsel." *Walker*, 863 So. 2d at 11. Howard cannot meet both prongs of *Strickland*, and the petition is denied as to this issue. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064.

**III. WHETHER THE LOWNDES COUNTY DISTRICT ATTORNEY, THE CITY OF COLUMBUS CHIEF OF DETECTIVES, THE CITY OF COLUMBUS CHIEF OF POLICE, AND OTHERS CONSPIRED TO CONCEAL AND SUPPRESS EXCULPATORY EVIDENCE MATERIAL TO THE PETITIONER'S INNOCENCE AND THE MISCONDUCT OF THE PROSECUTING AGENCIES VIOLATED THE PETITIONER'S DUE PROCESS RIGHTS.**

¶66. Howard adopts his arguments and allegations from issue I and contends that he "was denied his fundamental right to a fundamentally fair grand jury proceeding and as a result, he suffered prejudice." Howard again alleges that (1) the evidence collected during the investigation of the crime has been concealed by the State; (2) this evidence is exculpatory; (3) this exculpatory evidence was also concealed from the grand jury; and (4) the State's case, as it was submitted to the grand jury, was very weak and included "alleged perjured testimony of Kayfen Fulgham."[19] Apparently, Howard is arguing that because the State acted in bad faith in concealing exculpatory evidence, his conviction and sentence should be vacated and the indictment should be dismissed with prejudice. Howard cites several cases as authority for the argument that when prosecutorial misconduct is sufficiently egregious,

---

[19]Kayfen Fulgham's alleged perjured testimony is discussed in issues II. C. 1. and IV.

46

courts may dismiss the indictment. *See, e.g., **United States v. Holloway***, 778 F.2d 653, 655 (11th Cir. 1985).

¶67.   As discussed in issue I, Howard has failed to prove that the State has concealed any evidence, let alone exculpatory evidence.  Accordingly, Howard has failed to prove any prosecutorial misconduct.  Howard is not entitled to any relief, and his petition for post-conviction collateral relief is denied as to this issue.

IV.   **WHETHER THE TRIAL COURT ERRED IN DENYING THE PETITIONER'S DISCOVERY MOTION TO DEPOSE MATERIAL WITNESSES PRIOR TO THE FILING OF HIS PETITION FOR POST-CONVICTION RELIEF AND THEREBY, VIOLATED THE PETITIONER'S DUE PROCESS RIGHTS AND DENIED THE PETITIONER OF EQUAL PROTECTION OF THE LAWS.**

¶68.   During pre-petition discovery, Howard sought to depose Kathy, Fulgham, Allgood, Donald Freshour, Selvain McQueen, and Louis Alexander.  Howard alleges that these people were "material witnesses possessing relevant and discoverable matters."  Howard contends that depositions were necessary because each person refused to provide an affidavit to the MOCPCC and that the circuit court erred in denying his motion to depose these witnesses and that his due process and equal protection rights were violated.[20]

---

[20]The discussion of issue II.C.1 is related to this issue.  Additionally, we have already considered and rejected this argument.  Following the circuit court's refusal to allow the depositions, counsel for Howard filed a Petition for Writ of Mandamus and/or Extraordinary Relief, or in the Alternative, Interlocutory Appeal by Permission.  In this petition, Howard argued that the circuit court erred in refusing to allow him to depose Kathy, Fulgham, and Selvain McQueen.  We entered an order denying the petition on December 17, 2004.

47

¶69. Discovery in capital post-conviction proceedings is governed by M.R.A.P. 22.

M.R.A.P. 22(c)(4)(ii) provides, in pertinent part,

> (ii)    Upon appointment of counsel, . . . the petitioner's prior trial and appellate counsel shall make available to the petitioner's post-conviction counsel their complete files relating to the conviction and sentence. The State, to the extent allowed by law, <u>shall</u> make available to post-conviction counsel the complete files of all law enforcement and prosecutorial agencies involved in the investigation of the crimes committed and the prosecution of the petitioner. If the State has a reasonable belief that allowing inspection of any portion of the files by post-conviction counsel for the petitioner would not be in the interest of justice, the State may submit for inspection by the convicting court those portions of the files so identified. If upon examination of the files, the court finds that such portions of the files could not assist the capital petitioner in investigating, preparing, or presenting a motion for post-conviction relief, the court in its discretion may allow the State to withhold that portion of the files. <u>Discovery and compulsory process may</u> be allowed the petitioner from and after the appointment of post-conviction counsel. . . but <u>only upon motion</u> indicating the purpose of such discovery and that such discovery is not frivolous and is likely to be helpful in the investigation, preparation or presentation of <u>specific issues</u> which the petitioner in good faith believes to be in question and proper for post-conviction relief, and <u>order entered in the sound discretion of the court</u>. . . .

(emphasis added). In ***Russell v. State***, we provided "guidance to the bench and bar in dealing with discovery issues in capital post-conviction proceedings." ***Russell***, 819 So. 2d at 1177. Following appointment of post-conviction counsel, Russell sought discovery of items and information held by the State. The circuit court initially allowed compulsory process and directed the State to deliver certain documents, but then vacated that order and endorsed the filing of a petition for extraordinary relief with this Court. ***Id***. at 1177-78. In granting the petition, we held,

48

The pending petition does not seek a ruling on the specific entitlement to any of these items; rather, it seeks an adjudication of the authority and jurisdiction of the trial court to hear and determine them at this stage of the proceedings.

Russell does, however, set out in his petition in limited detail the nature of the issues which he intends to argue in order to demonstrate that Judge Evans may find justification for the discovery and to negate any argument that he is simply on a fishing expedition. Without detailing his arguments and theory here, it is sufficient to say that upon hearing Judge Evans may find justification for the discovery sought.

The State argues that the case was remanded to the circuit court solely for the appointment of counsel, and that under the post-conviction statutes, discovery is to be had, if at all, after this Court has granted leave to proceed on the motion for post-conviction relief. However, Russell will be <u>required to file</u> with his supplementary application to proceed in the trial court <u>a fully developed motion for post-conviction relief</u>. Under the Mississippi Uniform Post Conviction Collateral Relief Act, Miss. Code Ann. §§ 99-39-1 et seq. (2000), Russell <u>must include</u> in his motion <u>specific statements of facts not within his personal knowledge and submit affidavits of witnesses who will testify with copies of documents and records that will be offered</u>. *Id*. § 99-39-9(1)(e). Under § 99-39-11(2), failure to comply with these requirements may result in the summary dismissal of his post-conviction motion, and, under § 99-39-27(5), this Court <u>may not grant leave to proceed unless</u> his filings "present a substantial showing of the denial of a state or federal right." Further, Russell, as all others, is, upon entry of a final order and subject to only limited exceptions, allowed a single post-conviction motion by virtue of the successive writ bar of § 99-39-23. Because of these strictures, he argues that he must be able to obtain and to compel production of the evidence prior to the filing of the post-conviction application and motion in order to include them in compliance with the statute. Judge Evans, in his response to the petition, which this Court requested, states the problem well:

When an offender has directly appealed his conviction and sentence to the Supreme Court,

before he is allowed to file his motion with the circuit court, he must first file his motion with the Supreme Court. Petitioner's motion <u>must contain specific facts and be accompanied by supporting documentation to stand up to judicial review</u>. Although the State's Attorney takes great umbrage at this Court granting Petitioner any discovery, it only stands to reason that a Petitioner would need access to some information and documentation before he is able to properly form his potential legal claims.

In the case at bar, the Supreme Court ordered this Court to appoint counsel for Petitioner and to grant him investigative assistance. Surely the Court did not go through the trouble of granting Petitioner an attorney and investigative assistance if it intended to foreclose any real opportunity to produce a meaningful, complete petition. The Circuit Court in this case must be allowed to grant some initial discovery. Absent this authority, appointment of counsel and investigative assistance would be meaningless.

In its response, the State objects to the fact that proceedings regarding discovery were conducted in camera without notice to the State or an opportunity for the State to be heard and asks that if the Court determines that discovery at this stage should be allowed, such matters not be handled ex parte in the trial court.

During the past year, the Mississippi Legislature has taken action to reform the post-conviction process in death penalty cases. On July 27, 2000, this Court amended Rule 22 of the Mississippi Rules of Appellate Procedure to provide direction in such matters, and to the extent that the statutory and rule changes are remedial, they should be given application in cases pending at the time of their adoption. Rule 22 addresses the discovery and disclosure issues now before us.

\* \* \*

50

The State is justified in its complaint regarding <u>excessive use of ex parte proceedings on discovery</u>. The rule recognizes the <u>burden placed on the inmate to file fully developed post-conviction pleadings</u>. At the same time, the State is entitled to resist unwarranted discovery as well as unnecessary awards of investigative expenses, which will, at least implicitly, condone the areas of inquiry to be pursued in the investigation. Ex parte presentation should be available in proceedings for expenses and discovery, <u>but only after a determination that disclosure to the State is incompatible with a meaningful opportunity to prepare the defendant's case</u>. This necessarily entails service on the Attorney General of pleadings and notice of hearings.

To the extent that <u>discovery is allowed, the inmate is entitled to the compulsory process of the court</u>. It would be of no avail to declare that Russell is entitled to discovery, but not entitled to the process of the court to compel responsiveness.

*Id.* at 1178-80 (emphasis added).

¶70. As the State correctly points out, M.R.A.P. 22(c)(4)(ii) creates two kinds of discovery available to capital post-conviction relief petitioners: that which is mandatory and that which is within the discretion of the trial court. The depositions sought by Howard fall into the latter category. Therefore, pursuant to M.R.A.P. 22(c)(4)(ii), Howard had to file a motion with the circuit court seeking the discovery. The motion had to indicate "the purpose of the discovery and that such discovery is not frivolous." *Id.* Howard had to show that the discovery "is likely to be helpful in the investigation, preparation or presentation of specific issues" which are proper for post-conviction relief. *Id.*

¶71. In evaluating this issue, it should first be noted that Howard's motion seeking the depositions never mentioned Louis Alexander. "A trial judge will not be found in error on a matter not presented to him for decision." *Smith*, 729 So. 2d at 1205-06 (quoting *Jones*

51

*v. State*, 606 So. 2d 1051, 1058 (Miss. 1992)). Additionally, during the hearing on the motion, Howard only argued that he should be allowed to depose Kathy and Fulgham. During the hearing, counsel for Howard restated their allegations regarding Fulgham's alleged false trial testimony, but counsel failed to offer sufficient evidence to support the allegation. We find that Howard failed to show that the discovery was not frivolous and that Howard failed to show that the discovery would help in the preparation of specific post-conviction relief issues. Accordingly, Howard has failed to prove that the circuit court abused its discretion in denying Howard's request to conduct the depositions. The petition is denied as to this issue.

> ### V. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE EXPERT OPINION TESTIMONY OF DR. DAVID CURTIS IN THE FIELD OF DENTISTRY AS HE WAS NOT PROPERLY QUALIFIED PRIOR TO HIS OFFERING EXPERT TESTIMONY REGARDING THE TAKING AND PREPARATION OF DENTAL MOLDS.

¶72. The record reveals that on February 6, 1992, Howard consented to have Dr. Curtis take molds of Howard's teeth. At trial, after testifying to his background and qualifications, Dr. Curtis was accepted as an expert in the field of dentistry, without objection from defense counsel.[21] Dr. Curtis then testified to the methods he used in creating the molds and that those methods were generally accepted in the filed of dentistry for making accurate molds. Those molds were used by Dr. West in his examination of the wounds he found on Kemp's

---

[21]See the discussion in issue II. C. 3 regarding Howard's ineffective assistance of counsel claims regarding Dr. Curtis.

body. Dr. West testified at trial that the molds of Howard's teeth matched, to a reasonable degree of medical certainty, one of the bite marks found on Kemp's body.

¶73. Howard argues, "in view of Dr. West's own expert opinion concerning dental impressions, that it was prejudicial to allow the expert testimony of Dr. Curtis. . . . The accuracy and exactness of the methodology, procedures, and particular materials used in the preparation of the dental impressions/molds was equally critical to the weight which the jury might attach to such evidence." Howard asserts that the jury was allowed to speculate as to the probative value of Dr. Curtis' testimony and that the circuit court erred in allowing Dr. Curtis' testimony because the probative value of the testimony was outweighed by its prejudicial effect.

¶74. It should first be noted that this argument could have been raised at trial and/or on direct appeal and is procedurally barred. *See* Miss. Code Ann. § 99-39-21(1); ***Grayson v. State***, 879 So. 2d 1008, 1022 (Miss. 2004). Notwithstanding the procedural bar, this issue is also without merit. Although Howard now asserts that Dr. Curtis was not qualified as an expert and that he was not qualified to make the dental molds, it is quite telling that Howard does not offer the affidavit of an expert witness who opines that Dr. Curtis was not qualified as an expert in the field of dentistry. Nor does Howard offer an affidavit of an expert, or any other proof for that matter, that Dr. Curtis used improper methods in creating the molds and that the molds were not an accurate replica of Howard's teeth. We find that the circuit court did not err in accepting Dr. Curtis as an expert witness. *See* M.R.E. 702. Further it was not

53

error to allow Dr. Curtis to testify regarding the taking of Howard's dental molds. This issue is procedurally barred and without merit. The petition is denied as to this issue.

**VI. WHETHER THE CIRCUIT COURT'S LIMITING INSTRUCTION ON THE STATUTORY AGGRAVATOR ESPECIALLY "HEINOUS, ATROCIOUS AND CRUEL" WAS SUPPORTED BY THE EVIDENCE ADDUCED AT TRIAL AND FURTHER, WHETHER THE INSTRUCTION WAS CONSTITUTIONALLY INFIRM IN THAT IT WAS VAGUE AND OVERBROAD.**

¶75. Howard contends that the facts of this case "fail to provide a sufficient basis for the giving of the especially heinous, atrocious or cruel" aggravating circumstance and that the jury instruction regarding this aggravating circumstance was unconstitutionally vague and over broad. He asserts that "the subject limiting instruction fails to meaningfully narrow the class of murders that could fall within its scope" and that the jury instruction violated his constitutional rights. Howard argues that he is entitled to a new sentencing hearing.

¶76. "Under Mississippi law, the death penalty may be imposed only where the jury unanimously finds in writing that sufficient aggravating circumstances exist." ***Hodges***, 912 So. 2d at 785 (citing Miss. Code Ann. § 99-19-101(3)(b) (Rev. 2000)). One of the statutory aggravating circumstances is that "[t]he capital offense was especially heinous, atrocious or cruel." Miss. Code Ann. § 99-19-101(5)(h). During the sentencing phase of the trial, Instruction SSP-6 was given to the jury. That instruction states, "The Court instructs the Jury that the term 'especially heinous, atrocious and cruel' as used in these instructions is defined as being a conscienceless and pitiless crime which is unnecessarily torturous to the victim."

54

Howard argues that there was insufficient evidence to give the instruction, and that the instruction, as given, was unconstitutionally vague and over broad.

¶77.   Howard's argument regarding the sufficiency of the evidence is procedurally barred by the doctrine of res judicata. *See* Miss. Code Ann. § 99-39-21(3). On direct appeal, we found, in pertinent part, that

> there is evidence supporting the finding of the aggravating factors. . . . Also, the fact that Kemp suffered vaginal injuries, multiple scrapes and bruises about her body, and two stab wounds satisfies the Miss. Code Ann. § 99-19-101(5)(h) requirement that the crime be "especially heinous, atrocious, or cruel."

*Howard II*, 853 So. 2d at 798. Without waiving the procedural bar, this argument is also without merit. The record reveals that the evidence was sufficient to support this aggravating circumstance, including the fact that Kemp was beaten, strangled, raped, stabbed, and then left to die in her home which was set on fire.

¶78.   Howard's argument that the jury instruction was unconstitutionally vague and over broad could have been raised on direct appeal and is procedurally barred. *See* Miss. Code Ann. § 99-39-21(1).[22] Procedural bar notwithstanding, this argument is also without merit. We approved an instruction identical to Instruction SSP-6 in *Randle v. State*, 827 So. 2d 705 (Miss. 2002):

> the Supreme Court of the United States has [] held that the "heinous, atrocious and cruel" aggravating factor must be further defined in order to pass constitutional muster. *Clemons v. Mississippi*, 494 U.S. 738, 110 S. Ct. 1441, 108 L. Ed. 2d 725

---

[22]Trial counsel objected to this instruction and argued that it was insufficient to narrow the class of murderers eligible for the death penalty.

(1990). Further, this Court has expressly approved the following language:

> An especially heinous, atrocious or cruel capital offense is one accompanied by such additional acts as to set the crime apart from the norm of capital murders - the conscienceless or pitiless crime which is unnecessarily torturous to the victim. If you find from the evidence beyond a reasonable doubt that the defendant utilized a method of killing which caused serious mutilation, that there was dismemberment of the body prior to death, that the defendant inflicted physical or mental pain before death, that there was mental torture and aggravation before death, or that a lingering or torturous death was suffered by the victim, then you may find this aggravating circumstance.

*Knox v. State*, 805 So. 2d 527, 533 (Miss. 2002). While the language of SSP-5 is not identical to this language, we find that it is sufficient.

*Randle*, 827 So. 2d at 713-14.

¶79. Howard additionally relies on *Barksdale v. State*, 788 So. 2d 898 (Ala. Crim. App. 2000), as support for his argument that the limiting instruction was fatally flawed. We have recently rejected the identical argument, stating, "Last, Knox cites an Alabama case, *Barksdale v. State*, 788 So. 2d 898 (Ala. Crim. App. 2000). Knox argues that *Barksdale* sets a higher standard for the heinous, atrocious and cruel aggravator. Whether it does or not is irrelevant, as *Barksdale* has not been adopted by this Court." *Knox v. State*, 901 So. 2d 1257, 1261 (Miss. 2005).

¶80. Finally, even if we were to find this aggravating circumstance instruction to be constitutionally flawed, we are "authorized to reweigh the remaining aggravators against the

56

mitigating circumstances and affirm, hold the error to be harmless, or remand for a new sentencing hearing. Miss. Code Ann. § 99-19-105(5)(b) (Rev.2000)." *McGilberry*, 843 So. 2d at 29; *see also* **Scott v. State**, 878 So. 2d 933, 980 (Miss. 2004); **Davis v. State**, 897 So. 2d 960, 969 (Miss. 2004). There was sufficient evidence to support each of the remaining aggravating circumstances and there was no mitigating evidence. Accordingly, Howard is not entitled to a new sentencing hearing. This issue is procedurally barred and without merit. The petition is denied as to this issue.

**VII. WHETHER AGGRAVATING CIRCUMSTANCES ARE ELEMENTS OF THE CHARGED OFFENSE AND WHETHER THE INDICTMENT IS FATALLY DEFECTIVE IN THAT THE AGGRAVATING FACTORS HAVE NOT BEEN SET FORTH AND AS A RESULT, PETITIONER WAS NOT PROVIDED ADEQUATE NOTICE OF THE SPECIFIC OFFENSES OF WHICH HE WAS TO DEFEND, IN VIOLATION OF THE UNITED STATES AND MISSISSIPPI CONSTITUTIONS.**

¶81. Howard next argues that his indictment was fatally defective because the aggravating circumstances were not included in the indictment. This issue was capable of being raised on direct appeal and is procedurally barred. Miss. Code Ann. § 99-39-21(1). "The Petitioner carries the burden of demonstrating that his claim is not procedurally barred." *Jackson*, 860 So. 2d at 661 (citations omitted). Without waiving the procedural bar, this argument has also been considered by this Court and consistently rejected. *See* **Knox**, 901 So. 2d at 1269; **Gray**, 887 So. 2d at 173-74; **Brown v. State**, 890 So. 2d 901, 917-18 (Miss. 2004); **Mitchell**, 886 So. 2d at 710-11; **Berry v. State**, 882 So. 2d 157, 170-73 (Miss. 2004); **Puckett**, 879 So. 2d

57

at 944-46; *Holland v. State*, 878 So. 2d 1, 7-9 (Miss. 2004); *Simmons*, 869 So. 2d at 1008-10; *Stevens*, 867 So. 2d at 225-27. In *Brown*, we held,

> Brown urges that the prosecution must include in the indictment any aggravating factors which it intends to prove at the sentencing phase of the trial, and that because his indictment did not include a statutory aggravating factor or a mens rea element it is constitutionally infirm.

> This is not our law. The major purpose of any indictment is to furnish the accused a reasonable description of the charges so an adequate defense might be prepared. *See Williams v. State*, 445 So. 2d 798, 804 (Miss. 1984). Accordingly, all that is required in the indictment is a clear and concise statement of the elements of the crime charged. *Id*. at 804. Our death penalty statute clearly states the only aggravating circumstances which may be relied upon by the prosecution in seeking the ultimate punishment. *Williams*, 445 So. 2d at 805. Thus, every time an individual is charged with capital murder they are put on notice that the death penalty may result. *See Stevens v. State*, 867 So. 2d 219, 227 (Miss. 2003). This is the law of our state.

> Brown urges that the United States Supreme Court cases of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348 (2000), and *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428 (2002), bolster his position. They do not. We have previously discussed these cases at length and concluded that they address issues wholly distinct from our law, and do not address indictments at all. *See Stevens*, 867 So. 2d at 225-27. This issue is without merit.

*Brown*, 890 So. 2d at 917-18. This issue is without merit. The petition is denied as to this issue.

**VIII. WHETHER THE CIRCUIT COURT COMMITTED PLAIN ERROR IN SUBMITTING THE AGGRAVATING FACTOR OF A "MURDER DURING THE COMMISSION OF ARSON" TO THE TRIAL JURY FOR ITS CONSIDERATION.**

58

¶82. Howard argues that it was reversible error to instruct the jury regarding the aggravating circumstance that the murder was committed during the commission of arson. Howard asserts that "[p]rior to the use of the specific crime of arson as an aggravator, the petitioner must have first been charged with the crime of arson and found guilty thereof in the guilt phase." Howard argues that he is "entitled to formal notice by indictment of any and all crimes to defend if they are to be used against him to enhance punishment."

¶83. This issue is procedurally barred by Miss. Code Ann. § 99-39-21(2), which states, in pertinent part,

> The litigation of a factual issue at trial and on direct appeal of a specific state or federal legal theory or theories shall constitute a waiver of all other state or federal legal theories which could have been raised under said factual issue; and any relief sought under this article upon said facts but upon different state or federal legal theories shall be procedurally barred absent a showing of cause and actual prejudice.

On direct appeal, we found that "there is evidence supporting the finding of the aggravating factors. The jury found that the murder was committed while in the commission of a rape and arson. The finding of . . . arson was supported by evidence of two small fires which burned holes completely through the floor in Kemp's house." *Howard II*, 853 So. 2d at 798. Howard has failed to show that this procedural bar does not apply.

¶84. Additionally, without waiving the procedural bar, and as is discussed in issue VII, we have consistently held that "a defendant is not entitled to formal notice of the aggravating circumstances to be employed by the prosecution and that an indictment for capital murder puts a defendant on sufficient notice that the statutory aggravating factors will be used

59

against him." ***Stevens***, 867 So. 2d at 225-27 (citing ***Smith***, 729 So. 2d at 1224; ***Williams***, 445 So. 2d at 798). This issue is procedurally barred, without merit, and the petition is denied as to this issue.

> IX. **WHETHER THE SENTENCE RENDERED AGAINST THE PETITIONER IS DISPROPORTIONATE AND IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND CORRESPONDING PORTIONS OF THE MISSISSIPPI CONSTITUTION.**

¶85. Howard argues that his "death sentence is excessive in relation to the crime for which it was imposed." Howard also argues that "[a]pplying the death penalty to [Howard], as well as all defendants who are guilty of felony murder, violates federal case law because it ignores the mental state of the defendant and because there is no rational basis for treating a felony murderer more culpable than a depraved heart murderer." He contends that he should be granted a new sentencing hearing.

¶86. On direct appeal, we conducted a proportionality review as required by Miss. Code Ann. § 99-19-105 and found that "[c]ompared to other cases, the sentence of death here is not excessive or disproportionate." ***Howard II***, 853 So. 2d at 799 (citing ***Mitchell v. State***, 792 So. 2d 192 (Miss. 2001); ***Hughes v. State***, 735 So. 2d 238 (Miss. 1999); ***Gray v. State***, 728 So. 2d 36 (Miss. 1998); ***Crawford v. State***, 716 So. 2d 1028 (Miss. 1998)). Accordingly, this issue is procedurally barred from collateral review. *See* Miss. Code Ann. § 99-39-21(3).

¶87. Howard's "felony murder" argument could have been raised at trial and on direct appeal and is procedurally barred. *See* Miss. Code Ann. § 99-39-21(1). Additionally, we

60

have consistently rejected this "felony murder" argument. *See Le v. State*, 913 So. 2d 913, 943-45 (Miss. 2005); *Knox*, 901 So. 2d at 1267-69; *Gray*, 887 So. 2d at 171-72. In *Walker v. State*, we held,

> Walker further argues that the Mississippi death penalty statutes are unconstitutional in that they are applied to felony murders and "ignore the mental state and relative culpability of the defendant." Again, this claim was not raised at trial or on direct appeal and is procedurally barred from consideration for the first time in this post-conviction petition. *See* Miss. Code Ann. § 99-39-21(1); *Brown v. State*, 798 So. 2d at 491; *Wiley [v. State]*, 750 So. 2d [1193,] 1208 [(Miss. 1999)]; *Foster [v. State]*, 687 So. 2d [1124,] 1138 [(Miss. 1996)]. Therefore, absent a showing of cause and actual prejudice to overcome the procedural bar, this claim cannot be considered.

> Walker cannot show cause or actual prejudice as this claim has been ruled upon on numerous occasions. The Court has held that the fact Mississippi's capital murder scheme makes the death penalty a possible punishment for felony murder where there is no requirement to prove an intent to kill, and not premeditated murder, does not make the Mississippi capital murder statute unconstitutional. See *Grayson v. State*, 806 So. 2d 241, 252 (Miss. 2001); *Simmons v. State*, 805 So. 2d 452, 507 (Miss. 2001); *Edwards v. State*, 737 So. 2d 275, 307 (Miss. 1999); *Berry v. State*, 703 So. 2d 269, 286 (Miss. 1997); *Evans v. State*, 725 So. 2d 613, 683-84 (Miss. 1997); *West v. State*, 725 So. 2d 872, 894-95 (Miss. 1998); *Holland v. State*, 705 So. 2d 307, 319-20 (Miss. 1997); *Gray v. State*, 351 So. 2d 1342, 1344 (Miss. 1977); *Bell v. Watkins*, 381 So. 2d 118, 124 (Miss. 1980); *See also Gray v. Lucas*, 677 F.2d 1086, 1104 (5th Cir.), *reh'g denied*, 685 F.2d 139 (5th Cir. 1982). This same argument has been rejected as it relates to depraved heart murder. *See Grayson v. State*, 806 So. 2d at 252.

> In addition, the factors contained in Miss. Code Ann. § 99-19-101(7), require that the jury find the requisite intent set forth in *Enmund [v. Florida*, 458 U.S. 782, 102 S. Ct. 3368 (1982)] and *Tison [v. Arizona*, 481 U.S. 137, 107 S. Ct. 1676 (1987)] before a death penalty verdict can be returned. The jury

61

was properly instructed pursuant to Miss. Code Ann. § 99-19-101(7) and found two of those factors. That is all that is required by the decisions of the United States Supreme Court and the federal constitution. Walker has failed to show the necessary cause and actual prejudice to overcome the procedural bar to consideration of this claim. The claim is procedurally barred from consideration for the first time in this post-conviction application. Walker is entitled to no relief on this claim.

*Walker*, 863 So. 2d at 26. As in *Walker*, the jury was instructed regarding the intent factors contained in Miss. Code Ann. § 99-19-101(7). The record reveals that the jury found all four factors, including that Howard "intended that a killing take place." Howard completely ignores that finding. This issue is procedurally barred and without merit. The petition is denied as to this issue.

**X. WHETHER THE "AVOIDING OR PREVENTING A LAWFUL ARREST OR EFFECTING AN ESCAPE FROM CUSTODY" AGGRAVATING FACTOR WAS INAPPROPRIATE IN THIS CASE AND WHETHER IT WAS FUNDAMENTAL ERROR TO PRESENT IT TO THE SENTENCING JURY FOR CONSIDERATION FOR THE IMPOSITION OF A SENTENCE OF DEATH.**

¶88. Howard argues that the use of the "avoiding or preventing a lawful arrest or effecting an escape from custody" aggravator was inappropriate to his case, and its submission for the jury's consideration was plain reversible error. As the State points out, this issue is procedurally barred because it was capable of being raised at trial and/or on direct appeal.

62

*See* Miss. Code Ann. § 99-39-21(1).[23]   Additionally, the record reveals that this issue is

without merit.

> Under Mississippi law, the death penalty may be imposed
> only where the jury unanimously finds in writing that sufficient
> aggravating circumstances exist.   Miss. Code Ann.
> § 99-19-101(3)(b) (Rev. 2000).  One such aggravating factor
> requires the jury to consider whether "[t]he capital offense was
> committed for the purpose of avoiding or preventing a lawful
> arrest or effecting an escape from custody."  Miss. Code Ann.
> § 99-19- 101(5)(e) (Rev. 2000).

*Hodges*, 912 So. 2d at 785-86.  Howard contends that insufficient evidence existed to support

giving the instruction to the jury and Howard argues that his sentence should be vacated and

he should be re-sentenced to life in prison.

> The standard for reviewing the sufficiency of the evidence to
> support an "avoiding lawful arrest" instruction is well settled:

>> Each case must be decided on its peculiar fact
>> situation. If there is evidence from which it may
>> be reasonably inferred that a substantial reason for
>> the killing was to conceal the identity of the killer
>> or killers or to 'cover their tracks' so as to avoid
>> apprehension and eventual arrest by authorities,
>> then it is proper for the court to allow the jury to
>> consider this aggravating circumstance.

> *Brown v. State*, 682 So. 2d 340, 355 (Miss. 1996) (citing
> *Leatherwood v. State*, 435 So. 2d 645, 651 (Miss. 1983)).  "[I]t
> is this Court's role to inquire into whether there is any credible
> evidence upon which the jury could find the aggravating

---

[23]See issue II. D. 2 for a discussion of Howard's ineffective assistance of counsel
claims regarding this aggravating circumstance.  The State also argues that this
issue is barred by the doctrine of res judicata.  We disagree.  While we found on direct appeal
that "there is evidence supporting the finding of the aggravating factors," we discussed all
of the aggravating circumstances except the "avoiding arrest" circumstance. *Howard II*, 853
So. 2d at 798.

> circumstance in question." *Carr v. State*, 655 So. 2d 824, 854 (Miss. 1995) (quoting *Lanier v. State*, 533 So. 2d 473, 490 (Miss. 1988)). "[J]urors are entitled to make the logical connection between the injuries suffered and finding an inference that the defendant murdered his victim to avoid arrest." *Holland v. State*, 705 So. 2d 307, 355 (Miss. 1997). The defendant's efforts to avoid arrest after the murder may also be considered in connection with this aggravator. *Id.* at 355-56.

*Id.* at 786; *see also* ***Thorson v. State***, 895 So. 2d 85, 97-98 (Miss. 2004).

¶89. The record reveals that Kemp's telephone line had been cut and two fires were set in her living room. Additionally, Howard's own affidavit states, in pertinent part, that he "had recently been released from prison on a prior offense and [he] did not enjoy prison life." We find that there was sufficient evidence at trial to support this aggravating circumstance. *See* ***Hughes***, 735 So. 2d at 278. This issue is procedurally barred and without merit. The petition is denied as to this issue.

**XI. WHETHER THE DISTRICT ATTORNEY IMPROPERLY ELICITED EVIDENCE OF OTHER CRIMES, WRONGS OR ACTS TESTIMONY FROM STATE MATERIAL WITNESS KAYFEN FULGHAM AND AS A RESULT, THE PETITIONER SUFFERED UNFAIR PREJUDICE.**

¶90. During cross-examination by defense counsel and during re-direct examination by the District Attorney, Kayfen Fulgham mentioned that Howard had previously been in the penitentiary. Howard argues that the circuit court erred in denying Howard's motion for a mistrial, and Howard contends that his conviction and sentence should be vacated. As the State correctly points out, Howard raised this issue on direct appeal, and we found no error. ***Howard II***, 853 So. 2d at 789-90. We held,

Contrary to Howard's contention that the trial court should have immediately declared a mistrial, this assignment of error is without merit because the court instructed the jury to disregard Fulgham's answer. A mistrial is reserved for those instances where a trial court cannot take any action to correct improper occurrences inside or outside the courtroom. *Madere v. State*, 794 So. 2d 200, 214 (Miss. 2001) (citing *Walker v. State*, 671 So. 2d 581, 621 (Miss. 1995)). We have held a jury admonishment to disregard an answer is sufficient in cases where a witness makes an improper reference to a defendant's criminal background. *See, e.g., Smith v. State*, 835 So. 2d 927, 947 (Miss. 2002); *Cox v. State*, 793 So. 2d 591, 595 (Miss. 2001); *Brown v. State*, 534 So. 2d 1019, 1024 (Miss. 1988); *Payne v. State*, 462 So. 2d 902, 905 (Miss. 1984); *Johnson v. State*, 341 So. 2d 660, 662 (Miss. 1977).

*Id.* This issue is barred by the doctrine of res judicata and the petition is denied as to this issue. *See* Miss. Code Ann. § 99-39-21(3).

### XII. WHETHER THE *DAUBERT/KUMHO* GATE-KEEPING FUNCTIONS APPLY IN STATE DEATH PENALTY CASES.

¶91. Howard argues that "[t]he trial court erred by admitting Dr. West's bite mark testimony because it was not reliable." Howard contends that "Dr. West's methods in the field of forensic odontology lack[] relevancy and reliability, are not grounded in the methods and procedures of science, are not supported by appropriate validation, are not derived from the scientific method, and are not scientifically valid." Howard argues that, pursuant to the holdings of *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999), Dr. West's testimony should not have been admitted and that Howard's due

process rights were violated by the admission of Dr. West's testimony. Howard contends that his conviction and sentence should be reversed and he should be granted a new trial.

¶92. As the State points out, we considered and rejected this argument on direct appeal. *Howard II*, 853 So. 2d at 795-96.[24] In finding this argument to be without merit, we held that Dr. West's testimony

> was admissible, and the trial court did not abuse its discretion in so holding. We have ruled on more than one occasion that Dr. West's testimony is admissible and that he possesses the knowledge, skill, experience and training necessary to qualify as an expert in forensic odontology.

*Id.* In fact, Howard's argument in his petition echoes the dissenting opinion in his direct appeal. *Id*. at 799-807 (McRae, P.J., dissenting). We find that this issue is barred by the doctrine of res judicata and is barred from re-litigation by Miss. Code Ann. § 99-39-21(3). "Rephrasing direct appeal issues for post-conviction purposes will not defeat the procedural bar of res judicata. The Petitioner carries the burden of demonstrating that his claim is not procedurally barred." *Jackson*, 860 So. 2d at 660-61 (quoting *Lockett,* 614 So. 2d at 893). The petition is denied as to this issue.

### XIII. WHETHER THE USE OF A SINGLE SET OF DENTAL MOLDS FOR COMPARISON WAS A

---

[24]It should be noted that our discussion of this issue on direct appeal contains a misstatement of fact. The opinion states that "Dr. West testified that Howard's dentition matched the bite marks on Kemp's neck, breast and arm." *Howard II*, 853 So. 2d at 796 (emphasis added). Actually, Dr. West testified that Howard's teeth matched, to a reasonable degree of certainty, the bite mark on Kemp's breast. Dr. West did not find a "match" to the other bite marks. He opined that Howard's upper teeth were "consistent" with the bite mark on the arm and Howard's upper and lower teeth were consistent with the bite mark on the neck. Dr. West explained that "consistent" meant he could not exclude Howard as the biter, and that he could not state with any certainty that Howard was the biter.

**VIOLATION OF PETITIONER'S CONSTITUTIONAL RIGHTS.**

¶93. Howard again states that the use of bite mark evidence is "inherently unreliable" and he points out that Dr. West "was provided with only one set of dental molds with which to make a comparison." Howard cites several United States Supreme Court and Mississippi Supreme Court cases regarding impermissibly suggestive photographic identifications. Howard then states that "[t]he highly suggestive nature of the bite mark comparison was a violation of Howard's constitutional right to due process." He concludes that his conviction and sentence must be vacated and that he must be given a new trial "excluding the use of the bite mark identification."

¶94. As the State correctly argues, this issue was capable of being raised at trial and/or on direct appeal and is procedurally barred. *See* Miss. Code Ann. § 99-39-21(1). Additionally, without waiving the procedural bar, this issue is without merit. The cases cited by Howard hold that it is impermissibly suggestive to show an eye witness a photograph of the defendant only. Howard argues that those cases are analogous to Dr. West's analysis of a single dental mold. We disagree. Identification of the defendant by an eyewitness to a crime is distinguishable from an expert witness' conclusion, based upon scientific analysis, that a defendant inflicted a particular injury. This issue is procedurally barred, and the petition is denied as to this issue.

## XIV. HOWARD'S CLAIMS OF ACTUAL INNOCENCE.

¶95. Howard next "alleges actual innocence to the charges, which have been brought against him by the State of Mississippi, and in support of his claim he relies on newly

67

discovered evidence. . . . The newly discovered evidence is of constitutional dimension and necessitates that this Court extend the actual innocence exemption to procedural default of constitutional claims contained in his petition." Howard cites several United States Supreme Court and federal court decisions on the "actual innocence" exception to the procedural bar raised in successive, abusive or defaulted federal habeas claims. We are not sure what Howard is attempting to add with this argument. However, even if the federal habeas cases applied here, Howard has failed to prove that he is actually innocent. Howard contends that he has "presented a factual basis for his claim of actual innocence based on the new evidence discovered during the post-conviction investigation. The *Brady* violation, the probable perjured testimony of State witness Kayfen Fulgham, the unreliable testimony of junk scientist Dr. Michael West and the petitioner's credible alibi. . . present a factual scenario inconsistent with guilt." Howard additionally points to "allegations of bad faith on the part of the State." As is discussed in numerous issues above, Howard has failed to prove any of these allegations. Additionally, even if these allegations were true, it still does not prove that Howard is actually innocent of the charges. We find that this issue is without merit, and the petition is denied as to this issue.

**XV. WHETHER PETITIONER WAS DENIED HIS RIGHTS GUARANTEED BY THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE FEDERAL CONSTITUTION AND MISSISSIPPI LAW DUE TO THE CUMULATIVE EFFECT OF THE ERRORS AT HIS CAPITAL TRIAL.**

68

¶96.    Howard argues that the cumulative effect of the errors in his trial entitle him to post-conviction relief.  None of the claims raised by Howard warrant post-conviction relief.  Individual errors, not reversible in themselves, may combine with other errors to make up reversible error.  *Manning v. State*, 726 So. 2d 1152, 1198 (Miss. 1998) *overruled on other grounds by Weatherspoon v. State*, 732 So. 2d 158, 162 (Miss. 1999) (citing *Hansen v. State*, 592 So. 2d 114, 142 (Miss. 1991); *Griffin v. State*, 557 So. 2d 542, 553 (Miss. 1990).  The question under these and other cases is whether the cumulative effect of all errors committed during the trial deprived the defendant of a fundamentally fair and impartial trial.  *Byrom v. State*, 863 So. 2d 836, 847 (Miss. 2003).  Where there is "no reversible error in any part, . . . there is no reversible error to the whole."  *Id.* (quoting *McFee v. State*, 511 So. 2d 130, 136 (Miss. 1987).

¶97.    After a thorough review of the entire trial and of Howard's assignments of error, we find that Howard was not deprived of a fundamentally fair and impartial trial due to the cumulative effect of all alleged errors committed during the trial.  This claim is without merit.

### XVI.  WHETHER PETITIONER WAS DENIED DUE PROCESS AND A CONSTITUTIONALLY FAIR TRIAL DUE TO THE ALLEGED FALSEHOODS, MISREPRESENTATIONS AND PERJURED TESTIMONY BY DR. MICHAEL WEST.

¶98.    In his final issue, Howard again argues that the admission of Dr. West's testimony violated his right to a fair trial.  Howard contends that Dr. West's testimony was "replete" with "instances of false, incorrect and/or misstatements of fact."  Howard argues that "[t]he

69

jury could not make an informed decision when the information supplied to them was false."

He contends that he was denied a fundamentally fair trial and that his conviction and sentence must be vacated.

¶99.   This issue was capable of being raised on direct appeal and is procedurally barred. *See* Miss. Code Ann. § 99-39-21(1).  Additionally, without waiving the procedural bar, this issue is without merit:

> In adjudicating a claim involving the use of false testimony, the "any reasonable likelihood" standard has been applied to determine materiality.  *See* **Giglio**, 405 U.S. at 153-54, 92 S. Ct. 763.  Under that standard, "[a] new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury. . . .'" **Id**. at 154, 92 S. Ct. 763 (quoting **Napue v. Illinois**, 360 U.S. 264, 271, 79 S. Ct. 1173 (1959)).

**Barrientes v. Johnson**, 221 F.3d 741, 756 (5th Cir. 2000); **United States v. MMR Corp.**, 954 F.2d 1040, 1047 (5th Cir. 1992) ("[I]f the government used false testimony and knew or should have known of its falsity, a new trial must be held if there was any reasonable likelihood that the false testimony affected the judgment of the jury.")

¶100.  Howard specifically points to four of Dr. West's statements and contends they were false.  Each of those statements are regarding Dr. West's background and competence as an expert.  Those statements are not regarding his ultimate conclusion that Howard bit Kemp. At trial, defense counsel spent a significant amount of time examining Dr. West both during voir dire and cross-examination.  The jury heard ample information regarding Dr. West's credibility, or lack thereof.  Even if these statements were false, it is not reasonably likely that

70

they "affected the judgment of the jury." ***Barrientes***, 221 F.3d at 756. Accordingly, this issue is procedurally barred and without merit. The petition is denied as to this issue.

## CONCLUSION

¶101. In his Petition for Post-Conviction Relief, his Supplement/Amendment to Petition for Post-Conviction Relief, his Second Supplement to Petition for Post-Conviction Relief and his Reply to the State of Mississippi's Response to Petitioner's Petition for Post-Conviction Relief, Howard asserts that his conviction and sentence are constitutionally and procedurally flawed and should be vacated. We find that the issues raised by Howard are either procedurally barred and/or without merit. Howard's motion for leave to proceed in the trial court with a petition for post-conviction collateral relief is hereby denied.

¶102. It should finally be noted that both counsel for Howard and counsel for the State spend a significant amount of time attacking opposing counsel in their briefs. We are very concerned about the lack of civility between the lawyers in this case. This inability to work together in a professional manner caused significant problems during the discovery process in this case. As was noted in an order, both sides are responsible. The lawyers in this case must learn how to work together in a civil and professional manner. We will not tolerate such conduct in the future.

¶103. **PETITION FOR POST-CONVICTION RELIEF, DENIED.**

**SMITH, C.J., COBB, P.J., CARLSON, DICKINSON AND RANDOLPH, JJ., CONCUR. DICKINSON, J., CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY COBB, P.J. SMITH, C.J., WALLER, P.J., CARLSON AND RANDOLPH, JJ., JOIN IN PART. GRAVES, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY DIAZ, J. EASLEY, J., NOT PARTICIPATING.**

71

**DICKINSON, JUSTICE, CONCURRING:**

¶104. I fully agree with the majority's analysis of the issues in this case, and I write separately only to emphasize the difference between the deplorable conduct of Howard's attorney in making misrepresentations to the court, and Howard's claim that the conduct prejudiced his case, as measured by *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). While I share Justice Graves's concerns about the dubious conduct of Howard's former attorney, I cannot agree that counsel's misrepresentations to the court necessarily prejudiced Howard. Howard has failed to produce any affidavit or other evidence that his (or any other) bite mark expert would have effectively refuted Dr. West's testimony and found that the marks were inconsistent with Howard.

¶105. The *Strickland* standard requires "a reasonable probability that, *but for counsel's unprofessional errors*, the result of the proceeding would have been different." *Id.* at 694 (emphasis added). Even if Howard's counsel had not misrepresented his conversations with Dr. Souviron, we cannot say that the proceedings would have been different because we have no evidence that any expert has opined that Dr. West's findings in this case were incorrect. Among the many affidavits disparaging Dr. West, Howard could not produce a single opinion that the bite marks found on the victim did not come from him. Without this, I must agree with the majority that while Howard's counsel's actions were deficient, they do not require reversal.

**COBB, P.J., JOINS THIS OPINION. SMITH, C.J., WALLER, P.J., CARLSON AND RANDOLPH, JJ., JOIN THIS OPINION IN PART.**

**GRAVES, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶106. Because trial counsel was ineffective in not obtaining a bite mark expert to rebut the testimony of Dr. West, I respectfully dissent. As to the remaining issues, I concur with the majority in result only.

¶107. The majority acknowledges that trial counsel failed to retain an expert and that Dr. Souviron's affidavits constitute newly discovered evidence, which except this issue from the procedural bar. Further, the majority finds that the failure to call an expert was sufficient to demonstrate a deficiency in trial counsel's performance pursuant to ***Strickland***, 466 U.S. at 687, 104 S.Ct. at 2064. However, the majority also finds that Howard failed to prove prejudice, the second prong of the ***Strickland*** test, because he failed to provide an affidavit from an expert witness who rebuts Dr. West. I disagree.

¶108. Although the standard of prejudice under ***Strickland*** requires a defendant to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," ***Strickland*** also finds that "[a] reasonable probability is a probability **sufficient to undermine confidence in the outcome**." ***Id.*** at 694, 104 S. Ct. at 2068 (emphasis added).

¶109. Howard has provided numerous affidavits raising additional concerns regarding the credibility of Dr. West. Additionally, Howard has provided affidavits from Dr. Souviron, who plainly rebuts the claims made by trial counsel regarding his failure to retain Dr. Souviron. Furthermore, Dr. Souviron states that he has consistently disagreed with Dr. West regarding "pattern injuries" which Dr. West has interpreted as bite marks. I find that the

affidavits provided by Howard, combined with the legitimate skepticism regarding the testimony of Dr. West and the fact set out by the majority that "[t]he only evidence linking Howard to the crime was his alleged statement to Detective Turner that the case was 'solved' and the bite mark identification" are clearly "sufficient to undermine confidence in the outcome." Because I would find that Howard's counsel was ineffective for failing to retain an expert to rebut the State's expert, I must respectfully dissent in part as to this issue and concur as to result only with regard to the remaining issues.

**DIAZ, J., JOINS THIS OPINION.**